FRANK KICK v. WALTER FRANKLIN and FRANK C. NICODEMUS, JR., Receivers of THE WABASH RAILWAY COMPANY, Appellants.—117 S. W. (2d) 284.

Division One, May 26, 1938.*

*Homer Hall* and *Clark, Boggs, Peterson & Becker* for appellants.

---

*NOTE: Opinion filed at September Term, 1937, April 1, 1938; motion for rehearing filed; motion overruled at May Term, 1938, May 26, 1938.

*Cowgill & Popham, Mosman, Rogers & Buzard, Cave & Hulen, C. V. Garnett* and *John F. Cook* for respondent.

BRADLEY, C.—Action for personal injury received at a grade crossing. The verdict and judgment were for $35,000. Motion for new trial was overruled and defendants appealed.

Primary and humanitarian negligence were pleaded, but the cause went to the jury solely on humanitarian negligence. The answer was a general denial and a plea of contributory negligence. The reply was a general denial.

Error is assigned (1) on the refusal of a demurrer to the evidence at the close of the whole case; (2) on instructions given and refused; (3) on the admission of evidence; (4) on argument of counsel; and (5) on an alleged excessive verdict.

The demurrer to the evidence is based on the contention that the evidence was not sufficient to make a submissible case under the humanitarian rule. Most favorably stated for plaintiff, the facts are about as follows:

The crossing was quite extensively used by the public with the

knowledge and acquiescence of defendants. Plaintiff resided in Missouri City, Clay County, and was employed by Woods Brothers, who were doing revetment work on the Missouri River, a short distance west of plaintiff's home. Plaintiff was injured about 6:30 A. M., September 28, 1932, when on his way to place of work. He was driving a 1923 Buick sedan, and was accompanied by John Gorman, who was killed in the accident. [See Gorman v. Franklin et al., 117 S. W. (2d) 289, handed down concurrently herewith.] To go from his home to his place of work plaintiff went west on the highway for about a mile, and then turned south on a side road. The railroad runs east and west, and at that time was double tracked, and was a short distance south from where plaintiff turned, and part of this distance is down grade, but for about 25 feet immediately north of the north rail of the north track, the road was level. Plaintiff went down the grade in low gear. His car was about 15 feet in length from bumper to bumper, and it was about 7 feet from the front seat where he sat to the front bumper. He stopped when the front bumper was about 10 or 15 feet north of the north rail of the north track, and looked east (direction from which train came) and then west, but neither heard nor saw the train. From the driver's seat, when he stopped, he could only see east about 300 feet because of some brush and weeds and because of a bluff that ran along near the north side of the track, which bluff, at the crossing, was about 15 or 18 feet north of the north rail of the north track, and the brush and weeds were east of the crossing and were between the bluff and the track. How far east does not appear. Plaintiff started from the stop at 2 or 3 miles per hour, and moved slowly, in low, towards the crossing and could have stopped his car in 1½ or 2 feet. He was moving when "within 5 feet of the north rail" at "possibly 2 or 3 miles per hour," and when the front wheels of his car struck the north rail he was moving "possibly 2 miles per hour." There was substantial evidence that neither the whistle nor bell was sounded until just about the moment of impact the whistle was sounded. When his front wheels were "on or near the north rail," he, for the first time, saw the train (a passenger train) 300 or 350 feet away (so plaintiff testified), and approaching from the east on the north track, at 40 or 45 miles per hour. In this situation, plaintiff tried to accelerate his car and go on across, but the crossing was rough. Plaintiff testified: "There were boards on each side of the rail, and the rail stuck up about three inches and there were ruts in the road before you got to the rail." The road did not strike the crossing at right angles to it, but approached and passed over the crossing slightly to the southeast. The car was old and the pick up was slow, and the car was hit about midway, possibly a bit to the rear of the middle, resulting in the injuries complained of.

L. F. Buhalt, engineer on the train in question, was a witness for

defendants. In a digest of the evidence, separate from the abstract, defendants state the evidence of the engineer, which in part is as follows: "That when he saw the automobile it was coming from behind the bank and the front end of it was all he could see, and that in his judgment it was running about 10 miles an hour; that he didn't know the automobile was going on the track until it kept coming onto the track; that he saw it coming out of there and could not say that it stopped; that when he saw it was going onto the track he did all he could to keep from hitting it; that he could see the automobile over a distance of about 10 or 15 feet from the track when he first saw it, but could not tell how close the automobile was to the track, and it may have been closer to the track than 15 feet, but could not have been much farther than that; that he put the air into emergency the moment he saw the car approaching the track; that when he saw the driver was not going to stop and saw the car coming onto the track, he slapped the air on all at once; that he was certain his air was thrown into emergency before he struck the car, but he did not know; that he set the air the moment he saw the car approaching; that that was all he could tell; that he didn't know, the whole thing happened so quick—almost all about the same time; that when he saw the automobile come out from behind the bluff the front end of his engine was about 250 feet from the crossing."

The engineer further testified that as he approached the crossing he was looking ahead and giving the crossing signals; that he began sounding the whistle about three-quarters of a mile from the crossing, and continued to sound it at intervals; that the bell "was ringing coming through Missouri City and continued so until the crossing was passed." And there was other evidence that the crossing signals were given.

Defendants' witness Bennie Applegate testified that he was about 250 yards west of the crossing; that he saw the train, the automobile and the collision; that the automobile was traveling 20 or 25 miles per hour and did not slacken speed or stop before going on the track.

Some photographs taken the day following the accident were introduced in evidence by defendants, and these and the evidence in connection therewith, tend to show that at points 20, 25 and 30 feet north of the north rail and in the middle of the road, a man standing on the ground could see a man, standing on a motorcar on the north track, east of the center of the crossing, these distances respectively, 660, 388 and 255 feet.

After the accident, defendants made tests, physical conditions, so far as concerned here being the same (except the brush and weeds which plaintiff claimed were there), as at the time of the accident. From these tests it appears that from a point 21 feet north of the north rail, a man standing on the ground could see a flag 8 feet above the ground, 1600 feet east of the crossing; 23 feet back, the flag

could be seen 1200 feet; 24½ feet back, 1000 feet; 25 feet back, 900 feet. Defendants' witness, Cecil Clevenger, testified that he was familiar with this crossing, and had been for 15 years. "Q. As you went south or southeast across that crossing, how close would you be to the north rail of the north track, driving your car, before you had a fair view of the crossing to the east? A. Ten or twelve feet back. Q. At ten or twelve feet back, how far east could you see? A. Twelve to fourteen hundred feet. Q. Anything at that point, 10 or 12 feet back, to obstruct your view to the east, at all? A. No, sir."

Plaintiff's Instruction No. 1 is as follows: "The Court instructs the jury if you believe from the evidence that at said time defendants by their engineer Buhalt operated said westbound train on said north track, and that said crossing at and long prior to said time was habitually and greatly used by vehicles and the public with the knowledge and acquiescence of the Wabash Railway Company, and defendants and said engineer, if so, and that as said train approached said crossing said automobile was moving toward said tracks, and it would have been apparent to a reasonably careful engineer that plaintiff would likely drive upon said tracks and be struck by said train if there was no slackening of its speed and if no warning was given and that plaintiff was in imminent peril of being so struck and injured, if so, and that said engineer knew or by using ordinary care could have known thereof when far enough away from the crossing and in time thereafter by using ordinary care and the means at hand and with safety to said train and those on it to have warned plaintiff of its approach and of the proximity of the danger thereof, and so slackened its speed as to have thereby prevented said collision, if so, and that when said automobile was entering upon said tracks plaintiff was then in a position of imminent and inescapable peril from the approach of said train, if so, and that said engineer knew or by using ordinary care could have known thereof when far enough away from the crossing and in time thereafter by using ordinary care and the means at his command and with safety to said train and those on it to have so slackened its speed as to have thereby prevented said collision, if so, and that he failed to use ordinary care so to do and thereby *and in all the aforesaid respects* was negligent, if so, and that as a direct result of the aforesaid negligence, if you so find said engineer was negligent, said train struck said car and plaintiff was thereby injured, if so, then your verdict must be for plaintiff, Frank Kick, and this is the law and is true even if you should also believe that plaintiff Frank Kick was negligent in any manner in getting into such peril, if any, at said time." (Italics ours.)

As we read plaintiff's instruction, he submitted, or intended to submit, his case on two theories: First, that the engineer saw, or by the exercise of ordinary care could have seen plaintiff approaching

the track, and oblivious of his peril (obliviousness is not specifically predicated) and in time thereafter to have given warning of the train's approach and slackened the speed, so that plaintiff could have stopped before the front bumper of his car entered the path of the overhang of the pilot; and second, that the engineer, from the moment plaintiff's car entered the path of the overhang, could, by the exercise of ordinary care, have so slackened the speed of the train as to give plaintiff time to escape by going on across. These theories were submitted in the conjunctive.

Taking plaintiff's evidence as true that when he stopped the front bumper of his car was 15 feet north of the rail, and assuming that the overhang of the pilot is 2½ feet (the evidence does not show the overhang), then we have this situation. The front bumper of plaintiff's car is 12½ feet north of the path of the overhang; he moves the 12½ feet at 2 or 3 miles per hour, or approximately at 3 or 4½ feet per second. The train is approaching at 40 miles per hour, or approximately at 60 feet per second. At 2 miles per hour or 3 feet per second, plaintiff's car moved the 12½ feet in 4 1/6 seconds, and at 3 miles per hour or 4½ feet per second, he moved the 12½ feet in 2 7/9 seconds. He could, as stated, stop in 1½ or 2 feet.

It appears from plaintiff's evidence that his car was struck just slightly to the rear of its middle, and after it had moved (mathematical deduction) 25 feet and 4¼ inches from the point where plaintiff stopped. The distance of 25 feet, 4¼ inches is arrived at in this wise: 15 feet to the north rail; 4 feet and 8½ inches to the south rail; 5 feet and 7¾ inches beyond the south rail. If the car moved at 2 miles per hour or 3 feet per second, it required 8 65/144 seconds to move the 25 feet and 4¼ inches. If the train was approaching at 40 miles per hour or 60 feet per second, and so continued to the point of collision (and that is plaintiff's evidence), then when plaintiff started up from the point where he stopped, the train was 507 1/12 feet east of the point of collision. And if plaintiff's car traveled 3 miles per hour or 4½ feet per second, then when he started up, the train was 570 135/288 feet east of the point of impact.

██ A demurrer to the evidence can be sustained only when the facts in evidence and the legitimate inferences therefrom are so strongly against the verdict as to leave no room for reasonable minds to differ. [Young v. Wheelock, 333 Mo. 992, 64 S. W. (2d) 950, l. c. 954; Stauffer v. Metropolitan Street Ry. Co., 243 Mo. 305, l. c. 316; 147 S. W. 1032; Goucan v. Atlas Portland Cement Co., 317 Mo. 919, l. c. 929, 298 S. W. 789; Morris v. Atlas Portland Cement Co., 323 Mo. 307, 19 S. W. (2d) 865, l. c. 872; Cech v. Mallinckrodt Chemical Co., 323 Mo. 601, 20 S. W. (2d) 509, l. c. 511; Clark v. Atchison & Eastern Bridge Co., 324 Mo. 544, 24 S. W. (2d) 143, l. c. 151.]

In Alexander v. St. Louis-S. F. Ry. Co., 327 Mo. 1012, 38 S. W. (2d) 1023, the injured driver had stopped his truck 27 feet north of the track. After starting up he moved (on the up grade) to the track at 3 or 4 miles per hour and could "easily have stopped his truck in 3 feet." The train, approaching from the northeast at 45 miles per hour, was plainly visible when he was 17 feet from the track. In that case the plaintiff went to the jury on both primary and humanitarian negligence. He was held to be guilty of contributory negligence as a matter of law, but that he made a submissible case under the humanitarian doctrine. The court said: "According to the calculations appellant makes to convict respondent of contributory negligence, and assuming the speed of the train to have been 45 miles an hour, we think it a reasonable inference that when respondent, without stopping or slackening the speed of the truck, continued moving up grade and toward the track and came within 10 feet of the track or so near thereto as 5½ feet, it must have become apparent to the enginemen that, unaware of the approach of the train, he was about to enter upon the track, intent upon doing so and in a position of impending peril. At that point of time the train would have been approximately 495 to 429 feet or 7.5 to 6.5 seconds from the crossing, and a jury might well and justifiably conclude that a sharp blast of the whistle would have arrested respondent's attention and saved him from entering upon the track, since the truck could have been stopped within 3 feet, and that the enginemen were negligent in not acting promptly in giving an alarm under such circumstances."

Under the facts in the present case we think it was a question of fact as to whether or not the engineer saw or by the exercise of ordinary care should have seen plaintiff approaching the track and oblivious of his peril, in time to have thereafter sounded a warning of the approach of the train, so plaintiff could have stopped before reaching the path of the overhang of the pilot. A warning could have been sounded "in a second or the fraction of one" (Chawkley v. Wabash Ry. Co. et al., 317 Mo. 782, 297 S. W. 20, l. c. 27), and had a warning been given at any time before plaintiff got so near the path of the overhang that he could not stop, the collision might have been avoided, and such questions were, we think, for the jury. Defendants' demurrer to the evidence was properly refused.

Was there any substantial evidence to support submission on the theory of slackening the speed of the train as plaintiff submitted in his Instruction No. 1? For convenience we here repeat to some extent. Plaintiff's second theory is that the engineer, from the moment the automobile entered the path of the overhang, by the exercise of ordinary care, with safety, etc., could have so slackened the speed of the train as to give plaintiff time to escape by going on across. Plaintiff testified that when the front wheels of his car struck the track, he then, for the first time, saw the train, and that it was then

300 or 350 feet away. It is apparent that if the train, under plaintiff's first theory, was 507 1/12 or 570 135/288 feet from the point of impact when plaintiff started up, 15 feet north of the track, then it could not have been 300 or 350 feet from the point of impact when the front wheels of plaintiff's car struck the north rail, as plaintiff testified.

Assuming as true that plaintiff's car was struck 6 inches to the rear of its middle, and assuming it is 2 feet from the point where the front wheels first struck the track to the front bumper (no evidence on this point, but we think the assumption is fair), the car moved, before the impact, and after the front wheels struck the north rail, these distances: 2 feet, 8½ inches before the front bumper reached the south rail, and 5 feet and 7¾ inches beyond the south rail, a total of 8 feet and 4¼ inches. And at 2 miles per hour or 3 feet per second, the car moved the 8 feet, 4¼ inches in approximately 2.7 seconds. And at 4½ feet per second, the car moved the 8 feet and 4¼ inches in approximately 1.8 seconds. On these bases, when the front wheels of the car (moving 3 feet per second) struck the north rail, the train, if moving 60 feet a second, was 247 1/12 feet from the point of impact, and if the car was moving 4½ feet per second and the train 67½ feet per second, the train was 277 279/288 feet from the point of impact when the front wheels of the car struck the north rail. We are compelled to take these speeds of the car, because there was no showing what the pick up was or might be.

Plaintiff's car was 15 feet in length from bumper to bumper. Assuming, as above, it to be 2 feet from the front bumper to the point where the front wheels of the car first touched the track, the rear of the car, in order to clear, would have had to move forward these distances: 13 feet to the north rail; 4 feet, 8½ inches to the south rail; at least 2½ feet to clear the path of overhang of the pilot; a total of 20 feet, 2½ inches. At 3 feet per second, it would have required, to clear, approximately 6.7 seconds. At 4½ feet per second, it would have required, to clear, 4 53/108 seconds. If we take 4½ feet per second as the speed of the car and 60 feet per second as the speed of the train, then the train was 269 4/9 feet from the point of impact, and approaching at 60 feet per second, when plaintiff first saw it, and he could clear in 4 53/108 seconds. From all the evidence on the point, it is fair to say that at least 2 seconds would elapse from the time the engineer could visualize the situation, apply the brakes, and the brakes become effective. In these 2 seconds the train moved 120 feet, and is within 149 4/9 feet of the point of impact. And in these 2 seconds the rear of plaintiff's car, most favorably stated, has moved forward 9 feet, and yet has to go forward 11 feet, 2½ inches in order to clear. There is no substantial evidence, in this situation, that the speed of the train could have been so slackened as to permit the car to clear.

As we reason, the two theories upon which plaintiff submitted his case under the humanitarian doctrine are inconsistent. As we have ruled, there is no substantial evidence to support the theory that the speed of the train could have been so slackened as to permit plaintiff's car to clear by going on across, from the time that the front bumper of the car entered the path of the overhang. We have based the calculations upon the position of the car when the front wheels struck the north rail, but there would be no difference in the situation taken, than had we based the calculations upon the position of the car when the front bumper entered the path of the overhang.

Since plaintiff's Instruction No. 1 submits two inconsistent theories, the fact that these theories were submitted in the conjunctive cannot cure the error. "It is true that different acts of negligence which are consistent with each other may be united in the same petition, or the same count of petition, but it needs no citation of authority to sustain the position that the trial court cannot legally submit to the jury, by instructions, two separate and inconsistent theories of negligence." [Crews et al. v. Wilson et al., 312 Mo. 643, 281 S. W. 44, l. c. 46. See, also, State ex rel. Tunget v. Shain et al. 340 Mo. 434, 101 S. W. (2d) l. c. 3.]

Defendants assign error on plaintiff's Instruction No. 2 and the refusal of defendants' Instruction VI. Instruction No. 2 defined ordinary care in the usual way. Defendants, in their brief, say that "the definition is a correct statement of law, as far as the duty of the engineer is concerned," but say that "the instruction was not limited to the conduct of the engineer, but covered the use of the word 'negligence' and 'ordinary care' as applied to the driver Kick." As the cause was submitted, the negligence of plaintiff was not involved, hence there was nothing in the instruction to apply to him.

In view of our ruling as to plaintiff's case, it is not necessary to rule the assignment on the refusal of defendants' Instruction VI.

Much of the evidence on which complaint is made, in view of our ruling as to plaintiff's case, will not, on a retrial, be involved, and complaints on other evidence will not likely recur. The assignment on excessive verdict, of course, will not be ruled. Nor do we think it necessary to rule the assignment on argument. Such may be avoided.

The judgment should be reversed and the cause remanded. It is so ordered. *Ferguson* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by BRADLEY C., is adopted as the opinion of the court. All the judges concur, except *Douglas, J.,* not voting because not a member of the court when cause was submitted.