Tom F. McCall, Administrator of the Estate of Ella Shelton, v. Guy A. Thompson, Trustee, Appellant.—155 S. W. (2d) 161.

Division One, October 30, 1941.

*Thos. J. Cole* and *McReynolds & Flanigan* for appellant.

*Gardner & Gardner* for respondent.

DALTON, C.—Action for penalty for wrongful death. After verdict for defendant, a new trial was granted on account of errors in instructions, and defendant appealed. We have jurisdiction, because the amount sued for is $10,000.

Ella Shelton and her husband were instantly killed at a public grade crossing in Lawrence county on May 23, 1937, when the 1936 Chevrolet coupe in which they were riding was struck by one of defendant's trains. This suit was instituted by the administrator of Mrs. Shelton's estate on the theory that her husband did not survive her and that her nearest surviving relatives were her brothers and sisters. The cause was submitted on negligence under the humanitarian doctrine in failing to stop or slacken the speed of the train. Appellant first contends that plaintiff (respondent) failed to make out a case for the jury; that the demurrer to the evidence should have been sustained; and that, therefore, the new trial should not have been granted.

Defendant's tracks are straight for over a mile, extend northeast (more east) from La Russell and there is a slight upgrade. The gravel road between La Russell and Bowers Mill runs east from La Russell for one-half mile to a corner and then turns north crossing defendant's tracks almost at right angles. It is downgrade from this corner to within 400 or 500 feet of the crossing, then level to a point within fifty or sixty feet of the crossing, then upgrade for fifteen feet (a rise of three or four feet) to the south end of a twenty-four-foot wooden bridge. This bridge was old with some of the planks loose. It was eleven to twelve feet in width, only wide enough for one car, and had timbers extending lengthwise on each side of the bridge, forming a kind of rail or bannister. From the north end of this bridge it is upgrade for ten to fifteen feet (a rise of two feet), to the level of the track. North of the crossing the road runs downgrade and across a similar bridge. The crossing was marked with the usual crossing sign. West of the crossing defendant's tracks were on an embankment seven or eight feet above the surrounding land. As one approached the crossing from the south the view of defendant's tracks on the embankment to the west was unobstructed. From a point on

the railroad one-fourth mile west of the crossing, the road was in plain view for more than 100 feet south from the crossing. According to defendant's evidence, from a point 250 feet south of the crossing there was a clear view of defendant's tracks for 1150 feet to the west and, as one approached the crossing, the view of the tracks increased gradually until when one was within seventy-five feet of the crossing there was a clear view for 2400 feet. The view of the gravel road from the tracks was equally unobstructed.

Mrs. Shelton was sixty-five years of age, and was somewhat hard of hearing. She could see fairly well, although she had a cataract ██ on one eye and sometimes was unable to recognize her acquaintances, until she heard them speak. She was driving the automobile on this occasion, and drove regularly. She and her husband resided on a farm in Jasper county. They had attended the morning church services at La Russell and were going home, about 12:40 P. M. It was a clear day, the road was dry and visibility was good. The automobile was traveling north at about fifteen miles per hour, and the windows of the automobile were closed. The train, consisting of an engine, tender and two passenger coaches, was traveling east at fifty-five miles per hour. The train struck the automobile on the crossing. After the collision the automobile was fifty feet east of the east cattle guard and twenty feet north of the tracks. It was practically torn to pieces. The back fender on the left rear side of the automobile was "knocked off and dented in." The body of the car was dented and the tire of the left rear wheel knocked off. One of defendant's witnesses said the engine struck "the rear end" of the automobile. There was a mark along the center of the track, between the rails east of the crossing, where something had dragged. Mr. Shelton's body was found in the automobile and Mrs. Shelton's body was on the north side of the track east of the east cattle guard. Both parties were dead when the witnesses reached the scene of the collision.

Plaintiff called defendant's engineer as a witness. He testified that he was at his position, seated on the right side of the cab; that the train was traveling fifty-five miles per hour; that he could see the crossing for half a mile; that he saw the automobile when he was 500 feet away, "maybe a little more," from the crossing; that it was then 50 or 100 feet south of the crossing; that it was traveling "about 15 miles an hour, just a rough guess;" that it "just kept proceeding, . . . without stopping and showing no indication of stopping;" that he didn't notice any slackening of speed or indication that it was going to stop or that the driver saw the train; that the train struck the automobile "from the middle to the back" on the crossing; and that the train stopped 500 feet or more beyond the crossing.

On cross-examination he said that the bell was ringing; that he had given the regular crossing whistle, beginning a quarter of a mile west of the crossing; that, when he saw the automobile approaching and giving no indication of stopping, he sounded the alarm whistle, ex-

cessive and short blasts of the whistle, and continued them until after the engine passed over the crossing; that, when he saw that the automobile was not going to stop, he put on the emergency brakes; that he determined the automobile was not going to stop when the train was 500 feet or more from the crossing and when the automobile was 40 or 50 feet from the tracks; that he then put on the emergency brakes and gave the blasts of the whistle; that it takes two or three seconds for the air brakes to apply after you turn the emergency valve on; and that he knew this fact as he approached the crossing. He further said the brakes slowed the train to forty miles per hour by the time it reached the crossing and that he left the brakes on until the train came to a stop, as quickly as a stop could be made, beyond the crossing. He said he saw the automobile after it came out from behind a clump of trees "quite a little back from the tracks;" that he thought it was going to stop; that it was about 40 feet from the crossing when he realized it was not going to stop; that he had his hand on the brake lever, ready for an emergency, and pushed it over another notch to operate the emergency brake valves; that he knew nothing about the sight or hearing of the occupants of the automobile; that he put the emergency brakes on as soon as it appeared to him that the automobile was not going to stop; that there was nothing more that could have been done to stop the train; and that it was impossible to stop the train under 500 feet.

He described the engine and said it was equipped with automatic Westinghouse air brakes, straight air and sander. He said the brakes were in good condition and everything in working order; and that the train carried the standard of ninety pounds of pressure in the train line. He then discussed the operation of the automatic air brakes after they were turned on.

This witness was not contradicted, but corroborated, as to the giving of signals. He was the only witness as to the speed of the automobile as it approached the crossing. He gave the only testimony as to the distance of the automobile from the crossing and as to the distance of the train from the crossing, when he realized the automobile was not going to stop. Some of defendant's witnesses fixed the speed of the train at fifty miles per hour and said the speed was reduced to thirty miles per hour by the time the train reached the crossing.

Plaintiff's witness, A. J. Stutsman, testified that he lived on a hill one-fourth mile south of the crossing and was coming home from La Russell, along the road, when Mr. and Mrs. Shelton passed him; and that he later saw the train approach the crossing. He said: "I could see the train until it got close to where it hit them. I could only see some of the car tops where the engineer and fireman sat. . . . The top of the train, yes. I couldn't see the bottom part." He said the train stopped 500 to 600 feet beyond the crossing. He

was one-fourth mile away, but he heard the crossing whistle down the road and the emergency whistles before the train reached the crossing. He said: "It whistled up the road, all of the way up;" that he knew something was going to happen; that he heard the crash. He said the engineer cut off steam about fifty feet west of the crossing; and that there was no appreciable slackening of the speed of the train up to the crossing,—"none you could speak of." One of defendant's witnesses said: "The brakes took hold when they went over the crossing." Another of defendant's witnesses heard the "screeching of the brakes," "just before it hit." Some of defendant's witnesses said the train stopped 700 feet east of the crossing.

Two of plaintiff's witnesses, with twenty-five years' experience in railroad employment, who qualified as experienced engineers, testified that, with the equipment described and under the conditions existing at the crossing, defendant's train, traveling at fifty-five miles per hour, could have been stopped in less than 500 feet from the place where the emergency brakes were turned on. One said within 500 feet, if the train were loaded, and within 475, if not loaded. The other fixed the distance at 450 to 475 feet. Both described the operation of air brakes. One said they would take effect immediately, after being turned on and would begin to slow up the train. The other said that a turn of the valve would cause the brake shoes to hit in one-fifth of a second, but that it would take two or three seconds for the sand to hit the rails and help to check the train.

It is unnecessary to state defendant's evidence.

Appellant's statement in the brief covers only plaintiff's evidence and does not mention defendant's evidence, although defendant used thirteen witnesses. The statement concludes as follows: "This was all of the evidence of plaintiff. Defendant interposed a demurrer to the evidence which was overruled. (Abs. 132.) The appellant's contentions are: (1) Plaintiff did not make out a case under the humanitarian doctrine. The demurrer to the evidence should have been sustained. . . . "

The page reference, supra, is to the demurrer tendered at the close of plaintiff's evidence, but the record shows that, after it was overruled, defendant offered evidence and, thereafter, at the close of the whole case tendered a demurrer to all the evidence, which was overruled. There is no specific reference in appellant's brief to the demurrer which was offered at the close of the whole case. Respondent contends the assignment refers only to the demurrer at the close of plaintiff's case and that error, if any, was waived when defendant, thereafter, offered his evidence, citing Evans v. Farmers Elevator Co., 347 Mo. 326, 147 S. W. (2d) 593, 594. Since appellant urges the demurrer as against the granting of the new trial, we shall assume that the reference to "the demurrer to the evidence" is a reference to the demurrer tendered at the close of the whole case.

Appellant's theory is that no case was made for a jury, because only the engineer saw the approaching automobile and fixed its speed and distance and the speed and distance of the train from the crossing at said time; and that, since he testified "that immediately upon discovering plaintiff's decedent 40 feet from the track and in a position of peril and apparently oblivious (he) the engineer did everything possible to slacken the speed of the train and bring it to a stop," the plaintiff is bound by his testimony. Appellant argues that there is nothing in the record to contradict the engineer's testimony that, when it appeared to him the automobile was not going to stop, he immediately put on the emergency brakes and so did everything he could to prevent the collision.

▮ Plaintiff was not bound by the engineer's testimony, insofar as it was contradicted by evidence of other witnesses. The jury was at liberty to believe part of the engineer's testimony and disbelieve any part that conflicted with plaintiff's other evidence. [Smith v. Kansas City Public Service Co., 328 Mo. 979, 991, 43 S. W. (2d) 548, 553; Maginnis v. Mo. Pac. R. ▮ Co., 268 Mo. 667, 187 S. W. 1165, 1167.] It could believe his statement that, when he was 500 feet, or a little more, from the crossing and when deceased was 40 feet from the crossing, he realized that the automobile was not going to stop and gave the alarm whistles, but they could disbelieve his testimony that, at the same time, he turned on the valve for the emergency brakes. From his testimony, the jury could find that by reason of obliviousness the occupants of the automobile were in imminent peril when the alarm whistle was sounded and from other testimony they might find that the engineer did not act promply to stop or slacken the speed of the train.

▮ The train did not stop for 1000 to 1200 feet after the engineer said he turned on the emergency brakes. The jury could believe the witnesses who said the train could have been stopped within 500 feet, if the emergency brakes had been applied, and so reach the conclusion that the emergency brakes were not applied, as testified by the engineer. The engineer said the train slowed from fifty-five miles per hour to forty miles per hour, before it reached the crossing. Other witnesses said it did not slow down appreciably, until after it passed the crossing; but that the train could have been stopped within the 500 feet mentioned, if the emergency brakes had been turned on. The engineer fixed the speed of the train at fifty-five miles per hour, about 80 2/3 feet per second, and its distance from the crossing at 500 feet, or "a little more," and, therefore, more than six seconds from the crossing. He fixed the speed of the automobile at fifteen miles per hour, about twenty-two feet per second, and said it did not slow up or change speed. He fixed its distance from the crossing at forty feet, or about two seconds away, yet it is conceded the train hit the automobile on the crossing. If the engineer's testimony was correct, then

in less than three seconds the automobile would have been safely across before the train was within 250 feet of the crossing. These conflicts in evidence were for the jury.

Appellant further contends that the automobile at fifteen miles per hour did not come into a position of peril until it was within fifteen feet of the track; that it could have been stopped in less than fifteen feet; and that there was no duty to stop the train until the automobile reached the danger zone. Appellant quotes from Stark v. Berger, 344 Mo. 170, 125 S. W. (2d) 870, 871, as follows: "The engineer of the train had the right to assume that the deceased would stop before entering in the pathway of the train." The statement and reasoning is not applicable here because, while the automobile was yet forty feet from the crossing, the engineer, in his own mind and from his personal observation, determined that the automobile, by reason of the apparent obliviousness of its driver, was not going to stop and that its occupants were in peril from the approaching train.

In the case of Kloeckener v. St. Louis Public Service Co., 331 Mo. 396, 53 S. W. (2d) 1043, 1044, this court said: "There was evidence from which the jury was justified in finding that defendant's work car was at least 200 feet east of the intersection when plaintiff, not over thirty-five feet away from the track, looking away from the approaching work car, was proceeding across the street, with increasing speed, after starting from a complete stop until at the track he had gained momentum 'just enough to throw it in second.' Defendant argues that plaintiff was not in the danger zone when he was thirty-five feet away from the track. Where the danger zone commenced was a question for the jury under the facts and circumstances of this case. Defendant was operating its work car on a public street, approaching a much traveled intersection, where it had reason to expect persons to be and where it was required to keep a lookout. Its duty to stop or slacken the speed of its work car commenced at such time as the operator of its car saw, or could have seen by the exercise of ordinary care, that plaintiff was intent on pursuing this journey on across the track oblivious to the danger. (Citing cases.) Plaintiff's evidence, in fact, justifies the inference that this condition existed almost immediately after he started across the intersection and that the work car was then more than a block away."

We think the evidence sufficient to make a case for the jury under the humanitarian doctrine on negligent failure to stop or slacken the speed of the train after the engineer realized that the driver of the automobile, by reason of apparent obliviousness, was in imminent peril from the approaching train. [Kloeckener v. St. Louis Public Service Co., supra; Smith v. Kansas City Public Service Co., supra, 328 Mo. 979, 43 S. W. (2d) 548, 552; Zumwalt ▇▇▇ v. Chicago & A. Ry. Co. (Mo.), 266 S. W. 717, 724.]

■ Appellant next contends that plaintiff failed to prove that Harry Shelton, the husband, did not survive his wife, Ella Shelton; that the suit could not be maintained by her administrator; and that "the verdict for defendant was, therefore, a correct result."

Plaintiff alleged that Mrs. Shelton, "left no husband" surviving her. We have reviewed the evidence as to how both were killed and where their bodies were found. On this evidence the jury could well find that the husband did not survive his wife, but that both died at the same time. [Aley v. Mo. Pac. Ry. Co., 211 Mo. 460, 480, 111 S. W. 102, 108; Garbee v. St. Louis-San Francisco Ry. Co., 220 Mo. App. 1245, 1252, 290 S. W. 655, 656.] The demurrer to the evidence at the close of the whole case was properly overruled.

■ The record shows that the trial court ordered a new trial because "Instruction No. 9, given at the request of defendant, was erroneous," but no complaint is here made of this instruction. On the other hand, it is stipulated that the new trial was granted on the ground that "the court erred in giving defendant's instructions to the jury." Respondent complains of instructions 4, 5, 6, 7, and 8 given at defendant's request.

Instruction 8 is as follows: "You are instructed that the driver of an automobile on the streets, roads and highways of this state is required to exercise the highest degree of care, which means that such driver is expected to exercise that degree of care and caution for his or her own safety that is to be expected of a very careful and prudent person under like or similar circumstances, and, in determining whether or not the engineer on defendant's train should have realized that the driver of the automobile mentioned in the evidence was oblivious to the approach of said engine and train to the crossing mentioned in the evidence or would not reasonably bring said automobile to a stop before reaching said crossing, you should keep in mind the degree of care expected of the driver of an automobile on the highway and should judge the conduct of said engineer at that time in the light of the degree of care required of decedent, in determining whether or not said engineer at the time exercised reasonable or ordinary care."

Instruction 7 contained this statement, "By the term 'highest degree of care,' *as applicable to the driver of an automobile,* is meant . . . " (followed by definition). (Italics ours.)

This case was submitted solely under the humanitarian doctrine and no issue, as to the negligence of deceased being the sole cause, was submitted. We think that instructions 7 and 8, by referring to the degree of care *applicable* to, or *required* and *expected* of the driver of an automobile, were confusing and misleading. Contributory negligence is not a defense when recovery is sought under the humanitarian doctrine. In an action brought under the humanitarian doctrine instructions which inject the issue of contributory negligence, or set it

up as a defense, are erroneous. [Silliman v. Munger Laundry Co., 329 Mo. 235, 44 S. W. (2d) 159, 162; Schulz v. Smercina, 318 Mo. 486, 1 S. W. (2d) 113, 114; Gray v. Columbia Terminals Co., 331 Mo. 73, 52 S. W. (2d) 809, 813; Willhauck v. Chicago, R. I. & P. R. Co., 332 Mo. 1165, 61 S. W. (2d) 336, 339.] In a case submitted under the humanitarian doctrine the question of negligence or lack of negligence of the injured party should not be called to the jury's attention, unless by a sole cause instruction, and provided the evidence warrants such an instruction.

In the case of Lynch v. Baldwin (Mo.), 117 S. W. (2d) 273, 276, in criticising a somewhat similar instruction, this court said: "The first part of Instruction No. 11 was directed at the negligence of plaintiff and would suggest to the jury that plaintiff could not recover if the jury believed he was negligent in not exercising the highest degree of care for his own safety. Such is not proper where a cause is submitted only on humanitarian negligence, and, such being so, the jury's attention to the negligence of the plaintiff should not be suggested, except in a sole cause instruction."

It is well settled that it is error to inject the primary negligence of a defendant into an instruction submitting humanitarian negligence. [Reiling v. Russell, 348 Mo. 279, 153 S. W. (2d) 6, 8; Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S. W. (2d) 116, 123.] "The prior or antecedent negligence of neither plaintiff nor defendant enters into the humanitarian doctrine." [Gray v. Columbia Terminals ▇ Co., supra, 331 Mo. 73, 52 S. W. (2d) 809, 813.]

We think instructions 7 and 8 introduced an issue foreign to the case, and set up a standard for the jury to consider and measure the conduct of deceased, rather than directing attention to the proper issues in the case. Under the facts in this case, the jury was not concerned with the duty of the driver in the operation of her automobile, but with the operation of train after defendant's engineer saw or by the exercise of ordinary care could have seen the automobile and its driver in a position of imminent peril of the approaching train. The engineer was required to act upon appearances and not upon any legal duty imposed upon the driver or any occupant of the automobile. Under these instructions the jury might consider the rule stated, as applicable to the conduct of the driver (the deceased) both before or after the perilous situation arose and after a duty to act rested upon defendant. The instruction tended to emphasize the rules governing the conduct of the driver of the automobile which was not an issue in the case. The jury might well believe that no duty rested upon defendant, so long as deceased, by the exercise of the highest degree of care, could have avoided the collision, even though it was apparent to defendant's servants that she would not do so; and that she was therefore in peril. The instructions would lead a jury to believe that the duty of deceased to exercise the highest

degree of care continued up to the time of the collision and was a defense or an issue in the case; and that this obligation was not withdrawn or affected in any way by the fact that deceased came into a position of peril. The law imposed the duty upon the engineer to act when he saw or by the exercise of ordinary care could have seen deceased come into peril, regardless of her observance of any duty imposed and whether that peril was created by the negligence, or obliviousness of deceased, or by her inability to see or hear the train. Appellant contends that Instruction 8 did not submit contributory negligence as a defense, but that its consideration by the jury was limited to "determining whether or not said engineer at the time exercised reasonable or ordinary care." Appellant says: "The sole purpose of the instruction was to inform the jury that the engineer of the train had the right to *presume* that plaintiff's intestate in operating her automobile *would* exercise care for her own safety and would stop rather than drive into collision . . . ;" and that it tells the jury it "should keep in mind the degree of care *expected* of the driver." (Italics ours.) The humanitarian doctrine seizes the situation at the time defendant's agent sees or (where there is a duty to look) should see the other party in imminent peril. It is immaterial that the danger arose through the other party's negligence. The engineer may not presume one thing when he sees another.

In the case of Martin v. Fehse, 331 Mo. 861, 55 S. W. (2d) 440, 442, this court said: "That plaintiff is negligent in going into a place of danger or peril is immaterial in determining whether defendant was negligent, for the humanitarian rule applies even though the person injured is negligent, and, regardless of such person's negligence in getting into a perilous position, seizes and operates upon the situation thereby created and then resulting. Contributory negligence of plaintiff not being a defense, matter foreign and immaterial to a determination of the issues involved in the humanitarian doctrine, was thus presented to the jury in that connection. . . ."

Appellant relies on Clark v. Atchison, T. & S. F. Ry. Co., 319 Mo. 865, 6 S. W. (2d) 954, 960; Kirkdoffer v. St. Louis-San Francisco Ry. Co., 327 Mo. 166, 37 S. W. (2d) 569, 572; Stanton v. Jones, 332 Mo. 631, 59 S. W. (2d) 648, 652; Womack v. Mo. Pac. R. Co., 337 Mo. 1160, 88 S. W. (2d) 368, 371; Elkin v. St. Louis Public Service Co., 335 Mo. 951, 74 S. W. (2d) 600, 603. We find nothing in any of these cases that would warrant the approval of instructions telling the jury about any *duty* the law imposed upon the deceased either prior to or after the time that the humanitarian doctrine imposed a duty on the defendant's engineer to act.

Instruction 6 placed no duty on defendant's engineer to act until "it was reasonably apparent to said engineer that said driver was oblivious to the peril of passing over said crossing with said auto-

mobile and that said driver *in the exercise of the highest degree of of care* would not reasonably stop said automobile before reaching said crossing . . . " (Italics ours.) In effect this instruction told the jury that the engineer was under no duty to stop so long as deceased could, by ▮▮ the exercise of the highest degree of care, have stopped her automobile before going upon the crossing, but such is not the rule since the engineer may have known, or in the exercise of ordinary care could have known, that the driver was not exercising any care, was oblivious, was not intending to stop and was in imminent peril of the train.

▮▮ Instruction 5 is subject to the criticism that it excused defendant if, after the engineer discovered the peril, he applied his brakes and attempted to slacken speed, without requiring the jury to find the exercise of any care to discover this peril earlier and without requiring a finding that the application of the brakes was made as soon after the discovery of the peril as it could have been done in the exercise of ordinary care. [Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S. W. (2d) 562, 566.]

Instruction 5 concluded as follows: "and that, notwithstanding the said attempt to slacken the speed of said train, if you so find, decedent was killed at said crossing and the failure of decedent to hear or see said engine and train, or both, was solely due to a defect of hearing or eyesight, or both, of decedent, if you so find, then you will find the issues in favor of the defendant." In view of the way the cause was submitted it was wholly immaterial as to what caused the deceased to fail to see or hear the train and this part of the instruction stated no defense to defendant's liability, if any, under the humanitarian doctrine. On the other hand it singled out and gave undue prominence to particular facts.

Respondent says that Instruction 4 is not confined to the facts disclosed by the evidence, since the engineer admitted he saw the automobile approaching. If that criticism is correct, the plaintiff's Instruction 1 is subject to exactly the same defect and respondent may not complain.

The court did not err in granting a new trial on account of errors in instructions. The order granting a new trial is affirmed and the cause remanded. *Hyde* and *Bradley, CC.,* concur.

PER CURIAM:—The foregoing opinion by DALTON, C., is adopted as the opinion of the court. All the judges concur.