William Homer CUNNINGHAM, Plaintiff-Respondent,

v.

Guy A. THOMPSON, Trustee, Missouri Pacific Railroad Company, a corporation, Defendant-Appellant.

No. 44276.

Supreme Court of Missouri.

Division No. 1.

March 14, 1955.

Motion for Rehearing or to Transfer to Court en Banc Denied April 11, 1955.

Richard H. Beeson, David P. Dabbs, Dean F. Arnold, Kansas City, for appellant.

H. H. Harris, Jr., and S. L. Trusty, Kansas City, for respondent.

VAN OSDOL, Commissioner.

Defendant has appealed from a $55,300 judgment for personal injuries sustained when the automobile driven by plaintiff on a gravelled county road was struck by defendant's freight train at a point where the road crosses defendant's track at grade about one-fourth mile south of Hughesville.

Although there were averments of primary negligence of defendant, as well as averments of defendant's negligence under the humanitarian rule, the trial court at plaintiff's request submitted plaintiff's case to the jury solely on the issues of negligence under the humanitarian rule in failing to sound a warning or to slacken the speed of the train.

It was plaintiff's theory that in approaching the railroad crossing he was partially blinded by the rays of the sun and oblivious of the approach and danger of defendant's train; that his (plaintiff's) demeanor and the movement of the motor vehicle were such as to make his obliviousness reasonably apparent; and that defendant's employees in charge of its engine could and should have realized his obliviousness and imminent peril in time to have thereafter averted the casualty.

Herein upon appeal, defendant-appellant contends the trial court erred in overruling defendant's motion for a directed verdict. Defendant-appellant argues that the evidence was insufficient in tending to show that its employees had notice, actual or constructive, that plaintiff was oblivious of the danger of the train's approach in time for them to have averted the collision by warning plaintiff or slackening the speed of the train. On the other hand, plaintiff-respondent asserts the trial court correctly overruled defendant's motion for a directed verdict—it is said there was substantial

evidence tending to support the submission of plaintiff's case.

■ In examining the contention that plaintiff failed to make out a case, it is necessary for us to review the evidence, and we shall consider the evidence from a standpoint favorable to plaintiff. As a preliminary to such a statement, and also in anticipation of our examination of contentions of error in instructing the jury, we think it is pertinent to here restate in former language of this court the constitutive factual elements of a claim under the humanitarian rule.

■ In Banks v. Morris & Co., 302 Mo. 254, at page 267, 257 S.W. 482, at pages 484–485, it was said the constitutive facts "of a cause of action under the humanitarian rule, stated in their simplest terms, without any of the refinements, limitations, or exceptions which might arise on a particular state of facts, are contained in this formula: '(1) Plaintiff was in a position of peril; (2) defendant had notice thereof *(if it was the duty of defendant to have been on the lookout, constructive notice suffices);* (3) defendant after receiving such notice had the present ability, with the means at hand, to have averted the impending injury without injury to himself or others; (4) he failed to exercise ordinary care to avert such impending injury; and (5) by reason thereof plaintiff was injured.' Evidence tending to prove these facts makes a prima facie case for plaintiff. In some instances obliviousness of danger on the part of the plaintiff is necessary to make the situation in which he is placed one of peril. In such cases it is of course incumbent upon the plaintiff to make proof of the facts and circumstances tending to show obliviousness, not only for the purpose of establishing that he was in a position of peril, but to bring home to defendant a knowledge of his peril." (Our italics.)

At about eight-thirty o'clock in the morning of November 20, 1950, plaintiff, traveling eastwardly in a 1941 four-door Ford on a gravelled county road, sometimes called "Fowler Road", moved onto defendant's track and there the automobile was struck by defendant's northbound freight train consisting of a coal-burning steam locomotive with tender, four loaded and two empty freight cars, and a caboose. The train, including the locomotive, was 450 to 500 feet in length.

At the crossing (sometimes hereinafter referred to as "Fowler" crossing) where the collision occurred, defendant's (single) track line lies in a north-south direction—it is "just a little bit southeast to northwest." Defendant's track is in the center of a right of way 100 feet in width. The grade of defendant's track declines slightly throughout a distance of about 400 feet south from the crossing, and then ascends throughout a distance of several hundred feet to the southward. South of the crossing the elevation of defendant's track is somewhat higher than the elevation of the land to the westward. At a point, approximately 500 feet south of the crossing, there is a culvert accommodating drainage from the more elevated land east of the track. A "crossing whistle" sign (for Fowler crossing) is situate 1314 feet south of the crossing. South of the crossing plaintiff's track is straight for well over 1200 feet. There is a clump of trees and brush about 80 feet west of defendant's track, and about 125 feet south of Fowler road.

East of defendant's right of way and north of the highway there was (prior to the collision) a "Railroad Crossing" sign. When the automobile driven by plaintiff was struck by defendant's train, the automobile was thrown northeastwardly striking and breaking the pole supporting the crossing sign. It seems the train struck the automobile at the approximate rear half of its right side. The automobile came to rest in a small drainage ditch five or six feet east of the track.

Approaching and coming to defendant's track from the west, over a distance of 100 feet, Fowler road irregularly ascends at an average grade of about 6.4 percent. Fifty feet west of defendant's track, the elevation of the roadway is (at the time of the collision) approximately five feet lower than the

elevation of defendant's track. The surface of the road at its approach to defendant's track is uneven. "The road itself was rough and then there wasn't any dirt up next to the rail. There was kind of a jump-off up on the crossing itself as you went up." A witness said, "there was a steep incline to get over, very steep. It was sharp, if you come over it, if you hit it fast, the front end of the car would come clear off of the ground."

Plaintiff testified that, driving eastwardly along Fowler road and approaching defendant's track, he stopped his automobile about 50 feet west of the track. He listened, and looked out through the front windshield and the side glass of the door. Although it was a rather frosty, hazy and cold morning, the sun was shining brightly. The sun shone on the windshield and had an effect on his sight distance down the track. In his best judgment, plaintiff saw down the track about 150 feet. He neither heard nor saw a train. He slowly put the car in low and looked the road over to pick a path. In approaching the track he gradually gained speed. He thought he was going six miles an hour when he was hit, maybe a little more. "It wouldn't be very much more." Had he heard a warning when he was 15 feet from the track, "along about there", he believes he could "almost have stopped by taking my foot off of the accelerator." When he was eight or ten feet from the track, he could have stopped "almost instantly." By this he apparently meant he could have stopped "in probably five feet", although at another time while testifying he said he could have stopped, anytime, in "I would say two or three feet."

Defendant's train, in approaching Fowler crossing from the south, was moving 18 or 20 miles per hour. Moving slightly upgrade, the operation was by a "drifting throttle." Defendant's engineer and fireman testified they did not see plaintiff approach the crossing. The engineer said he first saw plaintiff's automobile "come out from around the front of the engine. It headed toward me. * * * The front end of the car was right under the cab."

He had been sounding the statutory crossing whistle, the last blast of which began when the engine was 150 feet from, and was sustained throughout the time the engine was moving on up to the crossing. The steam from the whistle and smoke from the smokestack had interfered with his view of the crossing, and in looking toward the crossing he could not see very far to his left because of the boiler of the engine. However, the wind was blowing from the north and the railroad track is "just a little bit northwest", and more of the steam and smoke was blown toward the fireman's side of the cab. The engineer and fireman said there were intervals of time between the blasts of the statutory warning whistle during which there were clear views of the crossing. The bell was ringing. When the engineer saw plaintiff's car "come out from around" the front of the engine, he applied the emergency brakes.

The fireman testified that when the engine was approximately 200 feet from the crossing he had a clear view of Fowler road as exposed between defendant's track and the easterly side of the clump of trees southwest of the crossing. There was no motor vehicle there on Fowler road at that time. But the fireman said that, when the engine sounded the last blast of the crossing whistle, steam from the whistle drifted down and over the fireman's side of the cab so as to obstruct the fireman's view throughout the distance over which the engine moved on up to the crossing. (There was evidence introduced by plaintiff tending to show that in the circumstances, including atmospheric conditions, obtaining at the time of the approach of defendant's train, steam and smoke from the whistle and smokestack would not "affect the ability of the engine crew to see.")

The engineer, and other witnesses for defendant, said the train was brought to a stop with the caboose about two (railroad) car lengths, or about 100 feet, north of the crossing. Witnesses for plaintiff said the train had been brought to a stop with its rear end south of the crossing. One witness said the caboose was south of the crossing— about half way between the crossing and

the culvert. (The culvert, as stated, is about 500 feet south of the crossing.)

Witnesses for plaintiff, who were apparently attentive and in a position to hear, testified there were no warning signals given. However, one witness for plaintiff said she heard "short whistles, which to me indicated that there was trouble there."

Various witnesses testified as to "reaction time." Their opinions of the time required for reaction upon the realization of danger varied from one fourth of a second to two seconds.

The witnesses also were of varied opinions as to the distance within which the train could have been stopped, and as to the rates of speed to which the train could have been slackened within given distances by the application of brakes. It was the testimony of a witness for plaintiff that defendant's train moving northwardly slightly upgrade in approaching the crossing could have been stopped in approximately 200 feet by an emergency application of the brakes; and the train could have been brought to a "service brake" stop in probably 300 to 350 feet. The witness further testified the train could have been slowed from a speed of 20 miles per hour to a speed of four or five miles per hour in 150 feet by an emergency application of the brakes; and, by a service application, to eight or nine miles per hour in the distance of 200 feet. A witness for defendant estimated the stopping distance by an emergency application of brakes to have been 580 feet, and the witness said the train could have been brought to a service stop in 750 feet. Another of defendant's witnesses said that, upon an emergency application, the train would go 640 feet before coming to a stop; but, he said, that at 120 feet the train would begin to slow down. These opinions or estimates included the movement of the train during reaction time and the time necessary for the brakes to "take hold."

According to his testimony, as stated, plaintiff approached defendant's crossing and stopped 50 feet west of the track. He then moved slowly forward with gradually increasing speed, having attained a speed of about six miles per hour when the automobile was struck by the train. Ignoring defendant's evidence that its engineer and fireman could not see plaintiff's approach, defendant was charged with constructive notice that plaintiff, having stopped 50 feet west of the track, had then moved on with gradually increasing speed in further approaching and moving onto the track. Although, in the circumstances, it may be that defendant may not be reasonably charged with notice that plaintiff's view down the track was partially blinded by the rays of the sun, nevertheless, some time after plaintiff moved on (from a stop) over the inclined rough surface of the roadway at gradually increasing speed toward the track, it could be reasonably said that the conduct of plaintiff and the movement of the automobile reasonably manifested plaintiff's obliviousness of the danger of the train's approach. As we have stated, plaintiff testified that, when he was yet eight or ten feet west of the track, he could have stopped within a distance of five feet. The time consumed by plaintiff in moving the automobile from a stop at a point 50 feet west of the track to a point ten feet west thereof (at which place, it may be reasonably inferred from his testimony, plaintiff could have stopped short of the overhang of the engine of the train) must have been approximately nine seconds (assuming he had gradually increased speed to the rate of six miles per hour when he was yet ten feet west of the track). We believe the jury could have reasonably found that plaintiff was in fact oblivious, and had, in the manner as stated supra, manifested the reasonable appearances of obliviousness and consequent imminent peril; and that there was time thereafter for defendant's fireman to react and to say, "Whistle!", and for the engineer to react and to pull the whistle cord, and for plaintiff to hear and to react to the sound of the whistled warning and to stop the automobile in safety short of the overhang of defendant's engine and train. Compare Harrington v. Thompson, Mo. Sup., 243 S.W.2d 519; Cable v. Chicago, B. & Q. R. Co., 361 Mo. 766, 236 S.W.2d 328.

Womack v. Missouri Pac. R. Co., 337 Mo. 1160, 88 S.W.2d 368.

Now, as may be noted supra, in considering the question of the submissibility of plaintiff's case on humanitarian negligence in failing to warn, we have assumed that plaintiff attained the speed of six miles per hour when he was ten feet west of the crossing. Actually, plaintiff testified that he moved with gradually increasing speed until he had attained a speed of six miles per hour (not very much more, he thought) when he was hit. When struck by the train the automobile had apparently moved to the point where nearly half of its length had passed beyond (east of) the track. So the automobile had moved something like 60 feet after it had moved from a stop 50 feet west of the crossing. During this movement, there must have been a lapse of time of approximately thirteen seconds. When plaintiff moved on from the point 60 feet west of the point of collision, defendant's train, moving at 20 miles per hour, was a little over 380 feet south of the crossing. We think it could have been reasonably found there was sufficient time (considering the evidence of the distances within which the speed of the train could have been reduced from a standpoint favorable to plaintiff) for defendant's employees to have realized plaintiff's imminent peril and to have reduced the speed of the train enabling plaintiff to move on across the crossing and safely beyond the overhang of defendant's engine and train.

■ It seems to us that plaintiff made out a submissible case under the humanitarian rule in failing to warn, and in failing to slacken the speed of its train. And we are of the further opinion there was no inconsistency in submitting humanitarian negligence in failing to warn and in submitting humanitarian negligence in failing to slacken speed under the facts of the instant case. The evidence supporting the one submission in this case was not inconsistent with and did not destroy the submissibility of the other. See State ex rel. Thompson v. Shain, 349 Mo. 27, 159 S.W.2d 582, explaining Kick v. Franklin, 342 Mo. 715, 117 S.W.2d 284.

At plaintiff's instance, the trial court gave verdict-directing Instructions Nos. I and II respectively submitting humanitarian negligence in failing to warn and to slacken speed. Instruction No. I was as follows,

"The Court instructs the jury that:

"When the engine was approaching the highway crossing at the time and place in question, it was the duty of the railroad through the engine crew to keep a constant lookout to discover persons in imminent peril, as herein submitted, of being struck by the engine at the crossing.

"So in connection with the above you are also instructed that: If you believe and find from all the facts and circumstances in evidence that Cunningham was unaware of and did not know of the approach and danger of the train and find from the facts and circumstances in evidence that it was reasonably apparent that Cunningham was unaware of and oblivious of the approach and danger of the train and find that it was reasonably apparent that he would probably continue on into the path of the train and find from the evidence that he was in imminent peril of being in a collision with the train; and if you so find, and

"Further find from the evidence that by keeping a constant lookout ahead the fireman or engineer or both of them could or should have known or realized from all the facts and circumstances in evidence that the automobile would probably continue on into the path of the train and that the operator of the automobile was so oblivious of the train and of the danger thereof and that he was so in imminent peril of being struck by the train, and further find from the evidence that by such constant lookout the fireman or engineer or both of them could or should have known of such danger and such imminent peril in time thereafter by the exercise of ordinary care in the use of the means at hand to have thereafter given timely and reasonably sufficient warning to the operator of the automobile of the approach and danger of the train and to have given such warning in time for the operator of the automobile, Cunningham, to have heard the warning

and for him to have heeded such warning and to have stopped the automobile in the clear and west of the train; and further find from the evidence that the engine crew failed to exercise such ordinary care to thereafter give such reasonable and timely warning; and if you so find and

"Further find from the evidence that such failure to give such timely and reasonably sufficient warning, either solely caused the collision and injuries to Cunningham, or so find that such failure to give such warning directly contributed with any act or omission or conduct of Cunningham to directly cause the collision and injury, then, in either of such events, it would be your duty to return a verdict for Mr. Cunningham and against the defendant; and this would be your duty even if you should find that Cunningham was guilty of contributory negligence that directly contributed to the cause of the collision and injury; and if you find in favor of Cunningham the matters to be as submitted in this instruction, then it would be your duty to find for Cunningham under this instruction regardless of how you find under Instruction No. II."

Plaintiff's verdict-directing Instruction No. II (in substance, in so far as material here) was like Instruction No. I, except that Instruction No. II, as stated, was designed to submit negligence of defendant under the humanitarian rule in failing to slacken the speed.

Defendant-appellant in its brief has made numerous attacks on these instructions in addition to the contention, with which we have, in effect, treated supra, that no substantial evidence supported the submissions.

We have seen the first paragraph of Instruction No. I (and of Instruction No. II) advised the jury that it was the duty of defendant through its engine crew "to keep a constant lookout to discover persons in imminent peril", and this when "the engine was approaching the highway crossing at the time and place in question." We have further observed that in the third paragraph of the instruction it is hypothesized that "by keeping a constant lookout ahead the fireman or engineer or both of them could or should have known or realized from all the facts and circumstances in evidence that the automobile would probably continue on into the path of the train * *, and * * * that by such constant lookout the fireman or engineer or both of them could or should have known of such danger and such imminent peril * * *."

■ It could not be correctly said defendant in this case had any duty, when its engine was approaching the highway crossing, to keep a constant lookout to discover persons in imminent peril apart from defendant's primary duty to keep a lookout for persons on or dangerously near the public crossing. It is the duty of a railroad (and its enginemen in charge of its train) when its train is approaching a public crossing to exercise ordinary care to prevent injury to persons or property on or dangerously near the crossing. When approaching a public crossing, the exercise of ordinary care includes the precaution of keeping a lookout. The duty is a primary one. The highway traveler also has the duty, when approaching a railroad crossing, to exercise the prescribed standard of care for his own safety. In the exercise of care, both the railroad and the highway traveler should take the precaution to look out for danger. The duties are reciprocal. Hackett v. Wabash R. Co., Mo.Sup., 271 S.W.2d 573, and authorities therein cited.

■ In our case Instruction No. I (and Instruction No. II) is so formulated as to reach into defendant's primary duty and, in different language, to rephrase and state that defendant had the duty when the engine was approaching the highway crossing, to keep a constant lookout to discover persons in imminent peril, which language— "it was the duty of the railroad * * * to keep a constant lookout to discover persons in imminent peril"—clearly contemplates a duty to keep a constant lookout inclusive of a time antecedent to when such persons may come into discoverable imminent peril. This was prejudicially erroneous in this case, we believe. Nor do we believe the

prejudicial character of this abstract. rephraseology is purged by the modifying words "as herein submitted." Indeed, these words tend to assume or to convey the advice that plaintiff was in imminent peril "as herein submitted."

█ It is prejudicial error in an instruction submitting humanitarian negligence to inject therein primary negligence of defendant (or contributory negligence of plaintiff). Anderson v. Prugh, Mo.Sup., 264 S.W.2d 358, citing Murphy v. St. Louis Public Service Co., 362 Mo. 772, 244 S.W. 2d 31, in commenting on the case of Hoelzel v. Chicago, R. I. & P. R. Co., 337 Mo. 61, 85 S.W.2d 126. See also McCall v. Thompson, 348 Mo. 795, 155 S.W.2d 161; Reiling v. Russell, 348 Mo. 279, 153 S.W.2d 6; Mayfield v. Kansas City Southern R. Co., 337 Mo. 79, 85 S.W.2d 116; Wholf v. Kansas City, C. C. & St. J. R. Co., 335 Mo. 520, 73 S.W.2d 195.

█ It is true, as stated, that defendant. had the duty to exercise ordinary care when approaching public highways to discover persons on or dangerously near its track, and to avoid injuring them. However, there may be no liability under the humanitarian rule imposed upon a defendant because of a breach of this primary duty. The failure to keep a lookout at a place where there is a duty to do so is of no significance under the humanitarian rule, except that in a case where a defendant had such a duty the rule is extended to discoverable as well as discovered peril. Banks v. Morris & Co., supra; Mayfield v. Kansas City Southern R. Co., supra; Womack v. Missouri Pac. R. Co., supra. In short, in a case wherein the humanitarian rule is applicable to discoverable peril, liability is predicated not upon a failure of a defendant to keep a lookout, but upon a defendant's failure to timely act upon what he could have seen if a lookout had been kept. Mayfield. v. Kansas City Southern R. Co., supra. It is imperative. that a defendant's duty to act under the humanitarian rule should be limited to the time after the rule seizes upon the situation. This, of course, is because a plaintiff's recovery is not

barred under the rule for his own antecedent or contributory negligence, and consequently, defendant should not be, and is not, under the rule, liable for his antecedent or primary negligence.

In this case defendant's employees testified they did not see plaintiff approach the crossing. Of course, the jury was not obliged to believe the employees' testimony that they could not see plaintiff's approach because of steam and smoke; and the resultant inference would be that they were not looking. Now the fact, as such, that the employees were not looking was immaterial as tending to prove any essential element of a humanitarian rule case; but Instruction No. I (and Instruction No. II) is so framed as to make such fact, if inferred, a causative factor in these humanitarian submissions.

Viewing Instruction No. I (and Instruction No. II) as a whole, we cannot see how the trier of the fact could be expected to differentiate between the primary duty of defendant, as rephrased in the first paragraph, from the same phraseology used as premises for the acts of omission or failures to act submitted as constituting humanitarian negligence. This, it seems to us, is especially true, when, as here, the jury was permitted to find that by keeping a constant lookout ahead defendant's fireman or engineer or both could or should have known or realized from "all the facts and circumstances in evidence" that it was reasonably apparent that plaintiff "would probably continue on" into the path of defendant's train.

As we have said, plaintiff had alleged primary negligence of defendant (in this connection, among the specific charges of primary negligence alleged was the failure "to keep any. or a sufficient lookout"), but the plaintiff's case was submitted solely under the humanitarian rule. By Instruction No. VIII, given at defendant's request, the jury was told "that you cannot return a verdict in favor of Mr. Cunningham on the ground that the defendant's enginemen negligently failed to see him, or negligently failed to sound a warning whistle or bell, or negligently failed. to take steps to stop

the train or slacken its speed before Mr. Cunningham was in a position of imminent peril, even if you find that they did negligently fail to do any of said things, * * *." And, at defendant's request, the trial court gave Instruction No. X advising the jury that "in arriving at your verdict you must confine your deliberations to the issues submitted to you by the Court in these instructions and you must not consider any question or issue not submitted to you for determination in these instructions."

██ It is the position of plaintiff-respondent that if plaintiff's Instructions Nos. I and II injected, or "opened to the jury the door" to a consideration of primary negligence, the limiting or withdrawal Instruction No. VIII (and the cautionary Instruction No. X) "effectively and forever closed such door." In support of his position, plaintiff-respondent cites the cases of Wright v. Osborn, 356 Mo. 382, 201 S.W.2d 935, and Pitt v. Kansas City Public Service Co., Mo.Sup., 272 S.W.2d 193. The Pitt case is not in point here. And, the reading of the Wright case [356 Mo. 382, 201 S.W. 2d 939] discloses that plaintiffs' instruction 2, given in that case, was not a verdict-directing instruction. It was an instruction defining the highest degree of care as being that " 'as would be exercised by a very careful and prudent person under the same or similar circumstances as those referred to in the evidence' ". We bear in mind that plaintiff's given instructions (Nos. I and II) in the instant case were verdict-directing instructions, purporting to cover plaintiff's entire case under the respective theories of humanitarian negligence in failing to warn and in failing to slacken speed. This court in the Wright case plainly noted that plaintiffs' instruction 2, given in that case, did not cover the entire case; did not authorize a verdict; and, being merely definitive in character, was not like the instructions ad-

versely ruled upon in cases like Reiling v. Russell, supra. We hold that defendant's Instructions Nos. VIII and X, when considered in combination with plaintiff's Instructions Nos. I and II, did not cure or correct the error in the Instructions Nos. I and II. Anderson v. Prugh, supra; Stith v. St. Louis Public Service Co., 363 Mo. 442, 251 S.W.2d 693, 34 A.L.R.2d 972; Harrow v. Kansas City Public Service Co., 361 Mo. 42, 233 S.W.2d 644.

██ Plaintiff-respondent finally urges that counsel for the parties, plaintiff and defendant, in their arguments to the jury urged the consideration of the evidence from a standpoint of defendant's conduct *after* plaintiff was in imminent peril, and that defendant's counsel explained that all antecedent conduct of both parties was "completely blotted out." Of course, the jury was bound to follow the trial court's instructions as read and given. A trial court—not counsel—instructs a jury. And, we know of no case which recognizes the principle or theory that counsel's argument may purge the prejudice of error in instructing the jury. Certainly the case of Jones v. Illinois Terminal R. Co., Mo.Sup., 272 S.W.2d 272, cited by plaintiff-respondent, does not purport to recognize such a principle. It is unnecessary to consider other assignments of error.

The judgment should be reversed and the cause remanded. It is so ordered.

LOZIER, C., dissents in part.

COIL, C., concurs.

PER CURIAM.

The foregoing opinion by VAN OSDOL, C., is adopted as the opinion of the court.

All of the Judges concur.