MAUDE C. HOLD, Administratrix of the Estate of WALTER W. HOLD, Deceased, v. TERMINAL RAILROAD ASSOCIATION OF ST. LOUIS, a Corporation, Appellant.—No. 40072.—201 S. W. (2d) 958.

Division Two, April 21, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, May 12, 1947.

*Warner Fuller* and *Arnot L. Sheppard* for appellant.

414

*Mark D. Eagleton* and *Wm. H. Allen* for respondent.

416

WESTHUES, C.—Plaintiff sued defendant, Terminal Railroad Association of St. Louis, for damages because of the death of her husband. A trial resulted in a verdict in plaintiff's favor in the sum of $45,000. A remittitur of $20,000 was ordered to which plaintiff consented and judgment was entered in the sum of $25,000. Defendant appealed.

The deceased, Walter Hold, a switchman, lost his life while the crew with which he was working was in the act of switching cars from one track to another. The case was submitted to a jury on two charges of negligence: First, that the foreman of the crew, Lewis, did not wait for Hold to give a signal to move the cars; second, that Lewis gave a signal to move the cars without first ascertaining that Hold was in a place of safety. The defendant, on this appeal, contends that its motion for a directed verdict should have been sustained because the evidence did not justify the submission of either charge of negligence to a jury; that since there was no negligence proven it was error for the court to give plaintiff's instruction number one. Other complaints, which we will discuss later, were lodged against this instruction. Defendant also contends that Hold's own negligence was the sole cause of his injury and death. Error was assigned to the giving of an instruction on damages because it authorized a recovery on the present value of decedent's future earnings, whereas there was no evidence to support such finding. Error was also predicated on the refusal of an instruction offered by the defendant and on the argument of plaintiff's attorney to the jury. We will dispose of these assignments in the order stated.

Defendant offered no evidence. The evidence introduced by plaintiff shows that on July 11, 1945, the train crew of which decedent was a member was engaged in switching cars in the defendant's yards at Eleventh street in St. Louis, Missouri. The tracks, at the point in question, run easterly and westerly. The switching movement in which Hold lost his life may be explained as follows: Twelve cars were attached to the front end of an engine which was facing west on track fourteen referred to as a lead track. The movements to be made were: First, to place the four westerly cars on track number one, which extended in a westerly and northerly direction from switch number one and track fourteen. The next move was to place the fifth car, or the next in line after the four cars above mentioned, on track two. Track two extended from track one in a westerly direction and south thereof, but north of ▮ track fourteen. In other words, track two was between tracks number one and fourteen. Track two was controlled by a switch referred to as number two. It was about sixty-five feet or so west of switch number one which controlled track number one. Switch stand number one was south of track fourteen, while switch stand number two was to the north of track fourteen and track number one. The train of twelve cars was drawn east on track number

fourteen until the most westerly was about ten feet east of switch number one. Lewis had given Hold the information as to the movements to be made. It was Hold's duty to throw the switches and properly line them for the movements. Hold crossed over track number fourteen from north to south to switch stand number one and threw the switch so as to divert the train of cars from track fourteen to track number one. Within thirty seconds or so thereafter he was run over at a point about thirty-five feet west of switch number one, north of the north rail of track number fourteen, south of the north rail of track number one and about twenty or twenty-five feet east of switch stand number two. It was admitted that Lewis, the foreman, gave the engineer the signal for this movement which resulted in Hold's death. The four cars passed through switches number one and two onto track number one where they belonged. They were, as said in railroad parlance, kicked on to their destination, which means that when the train had attained sufficient speed the four cars were cut loose and permitted to roll of their own momentum to the point where they were to be stationed. The engineer then stopped the train preparatory for the next movement, that is, the placing of the next car on track two.

The disputes between plaintiff and the defendant are principally over the question of Hold's and Lewis' duties and what the custom was, under like circumstances, with reference to giving the engineer signals to move the train. There is not much dispute as to the law applicable to the situation. Plaintiff contends that it was Hold's duty, after properly lining switch number one for the movement to be made, to go to switch stand number two for the purpose of seeing that the switch was properly lined and in proper condition for the cars to safely pass over; that therefore Lewis should have waited until Hold reached switch stand number two and originated the signal for the movement of the train. Plaintiff further contends that Lewis knew Hold's duties required him to go to switch number two and that in doing so he was required to cross the tracks over which the cars were to be pushed, therefore, it was the duty of Lewis to see that Hold was in no danger before giving a signal to move the train in that direction.

We are of the opinion that the evidence supports both charges of negligence. Questions of fact, in cases where the evidence is conflicting, are decided by a jury. We have searched the record for evidence supporting the finding of the jury, first, as to the charge that it was Hold's duty to go to switch number two, after properly lining switch number one, to see that switch number two was in proper condition for the movement of cars to track number one. We must remember it was necessary for the cars to pass over switches number one and two to get to track number one. There is no evidence that Hold knew how switch number two was lined or whether it was in proper condi-

tion. As to Hold's duty, the evidence shows the following: Lewis, the foreman who gave the signal for the movement, testified as follows:

"Mr. Eagleton: Q. Now, Mr. Lewis, it was part of Mr. Hold's duty as the switch tender there to see that the switch points on number 1 switch, the one we speak of as number 1 on the south side of the 14 lead as well as the number 2 switch, the switch points and latches were properly fastened and in secure position; that was his job, wasn't it? A. To throw the switches.

"Q. It was also, under the rules of the company it enjoined him to see that the switch points were properly fixed before any movement was made and that the latches were properly secured and fastened, that is right, wasn't it? A. Yes.

"Q. And that job, that part of the job was left up entirely to him, was it not? A. Yes."

The rule referred to reads as follows:

"'After changing a switch, carefully examine the points and be sure they safely fit for the proper route and that handle is securely latched if so equipped, before signaling train to use it.'"

Lewis further testified that the reason he gave the signal to move the train was that switch number one had been properly lined by Hold and he, Lewis, could see from where he was standing that switch number two was lined for the four cars to pass onto track number one. However, Lewis was some thirty feet or more from switch number two and did not examine it. Note his evidence:

"Q. All right. Now, as far as you were concerned, you couldn't possibly, from where you were standing, examine the switch points or the latches on number 2, could you? A. Not to make a thorough examination.

"Q. And you didn't attempt to do that for the very good reason that that was part of Hold's job, wasn't it? A. He was switch tender. When he throwed the switch over, he could very readily see.

"Q. But I say, you couldn't—you didn't try to make any inspection or examination of those switch points or the latches on number 2, did you? A. No, sir.

"Q. And the reason you didn't do that, you left that up to him, isn't that right? A. That is right.

"Q. And that was his duty and job? A. Yes, sir."

Walter L. Grimmer testified he had had forty years' experience with the Terminal Railroad Association and had worked as a switch tender. He further testified that a signal for the movement of a train through a switch, under circumstances as in this case, should originate with the switchman. Note what he said:

"Mr. Eagleton: That is part of the question, under the practice and custom who should it originate from under those circumstances? A. It should originate from the man that looked at the switch.

"Q. Who was that in this instance, in the instance that I mentioned? A. Mr. Hold.

"Q. Should there be any movement whatsoever of that train until Mr. Hold under those circumstances had given a signal to the switch foreman, Mr. Lewis? A. I don't think so.

"Q. Is that the way you had always seen it done, that way? A. Yes, sir.

"Q. Was that the custom and practice as long as you were there? A. Yes, sir.

"Q. Could you or could anybody standing off thirty feet from number 14 lead or sixty feet or any other distance, examine those switch points on number 2 or the latches on number 2, standing away that distance? A. Not very good.

"Q. Where did you make the examination and inspection that is required of you under rule 802, where do you have to go to make that inspection? A. Right up to the switch.

"Q. Right up to the switch. Is there any such a thing as times where the target will show green and then your switch points are apart? A. Oh, yes, lots of times.

"Q. And is there such a thing as the target showing green and the latches not being secure so that they will jump out under the weight of the train? A. Absolutely. That is done lots of times."

It was conceded that Hold did not give any signal for the movement to be made.

It is evident from the above evidence that it was the duty of Hold, after properly lining switch number one, to go to switch number two for the purpose of seeing that that switch was also properly lined so the cars would safely pass onto track number one. It is also evident that the signal to move the train should not have been given until Hold signaled that everything was in order. We must keep in mind that the next order of business for the train crew, after kicking the four cars onto track number one, was to place the next car on track number two, which meant that Hold would throw switch number two to divert this car from track number one onto track number two. So, in any event, Hold was required to be at switch stand number two. It was, therefore, his duty to go from switch number one to switch number two and Lewis knew this.

Appellant's counsel, in his argument on this point, has overlooked or ignored entirely the fact that Hold, in any event, was required to go from switch stand number one to switch stand number two. The fact, of which appellant makes much, that the cars safely passed over switch stand number two, is of no importance. The record fails to show that Hold knew how this switch was lined, and even if it was properly set he was required under the rule to see that it was in proper condition. Then too, as stated above, Hold was required to be at switch stand number two for the next movement. Citation of

authorities on this question would be of no value since the question simply is, was there evidence to support the charge of negligence? It is our conclusion that there was ample evidence to support the charge.

Appellant in its brief urges and contends that the evidence given by witness Powers cannot be considered because his evidence at the trial contradicted that given in a deposition. We need not discuss this point for the reason that we have totally ignored Powers' evidence and have found sufficient evidence to support the verdict aside from that given by him.

In disposing of the next contention made, that Lewis failed to watch the movements of Hold and to observe his whereabouts before and at the time of giving the signal to move the train, we must consider and keep in mind the facts heretofore stated. It is defendant's contention that the record is barren of any evidence to sustain this charge. Here again we turn to the evidence given by Lewis. We must consider his evidence in connection with the fact that he had given Hold instructions as to the switching movements to be made and therefore knew what Hold was required to do, in particular that Hold in performing those duties would go from switch stand number one across the tracks to switch stand number two. Now let us see what Lewis deemed was his duty as to seeing that Hold was in a safe place before giving a signal to move the train. Lewis testified as follows:

"Q. So in giving your signal to the engineer to start up, you took into consideration the safety of your pin puller, did you? A. Everybody concerned, as much as I could."

"Q. So that at the very time that you say you were so busy, one of the incumbent duties is for you, the foreman, to look after the men to see that they are in a position of safety before you could give a signal? A. Yes, sir, that is what I did."

There was other evidence to the same effect, that it was the duty of Lewis to see that his men were not in danger before giving a signal to move. His own statement will suffice for our purpose. Now the question is, did Lewis perform his duty as he testified he did? Hold, just before the train moved westerly, had lined switch number one for the movement. Lewis testified that he saw Hold do this and then did not see him again until after he was run over by the cars. Note the evidence of Lewis:

"Q. Now, you saw him stoop over to throw the switch? A. Yes, sir.

"Q. You don't remember which way it threw, whether it went to the right, toward his left or away from his right, you don't remember that? A. I don't remember.

"Q. But in any event, after he had thrown that switch, when you last saw him before he was hit, he was just straightening up, isn't that

correct? A. Yes, he had just about straightened up after throwing the switch.

"Q. After throwing the switch he had just about straightened up and wasn't completely straightened up, I believe you said, when you walked away, is that right? A. I walked out in the sunlight so I could see to give a signal."

.    .    .

"Q. During the time that you were walking east that twenty feet and during the time you were giving the signal, you never at any time looked at Hold to see where he was or what he was doing, is that right? A. That is right.

"Q. So the last time that you saw him was when he was just straightening up from having thrown the switch on the ▇▇ south side of the track, is that correct? A. Yes, sir.

"Q. And at all times after that your back was to him? A. Yes, sir.

"Q. And at no time·after that did you see him, until you heard some commotion and found that he had been run over, is that right? A. Yes, sir."

.    .    .

"Mr. Eagleton: Q. If you had at any time as you walked east and you were on the north side of that movement, had you turned your head to the right just as much as a glance, he was in a position where you could have seen him at any time then, isn't that correct? A. Yes, sir."

Certainly a jury could infer from this evidence that Lewis was guilty of negligence in not looking to see whether Hold was in danger before giving a signal to the engineer to move the train westward. It is our opinion, therefore, that the evidence was sufficient to submit both charges of negligence to a jury. This disposition dispenses with the necessity of considering appellant's contention that instruction number one was not supported by any evidence.

▇▇ Appellant, in addition to the contention that instruction number one, which authorized a verdict for plaintiff, was erroneous because not authorized by the evidence, contends it was erroneous because it assumed that when Hold was struck he was proceeding from switch stand number one to switch stand number two. We think appellant is in error. Lewis saw Hold at switch stand number one. Hold had been instructed as to his duties. His next duty required him to be at switch stand number two. He was struck when about half way between these two switch stands. In fact a witness named Jerome Burke testified he saw Hold crossing tracks number fourteen and one at the time he was struck by the cars and that he was walking toward switch stand number two. It was this witness who testified that at that moment a train was passing over a nearby track making a lot of noise. The only inference to be drawn from the evidence is that Hold was walking toward switch stand number two at the time he was

struck. The instruction did not assume this as a fact, but authorized the jury to so find from the evidence. The point must be ruled against appellant.

It is also urged that the instruction was erroneous because it used the phrase "before and at the time"; that such a phrase rendered the instruction uncertain and confusing. The phrase was used in that portion of the instruction .dealing with the duty of Lewis to observe the whereabouts of Hold before giving a signal to move the train. Defendant cites Lee v. Shryack-Wright Grocery Co. (Mo. App.), 53 S. W. (2d) 406, and Landon v. United Rys. Co. of St. Louis, 237 S. W. 496, in support of its contention. Instructions must be read and interpreted in light of the evidence adduced in support of the question submitted. We fail to see wherein this instruction was subject to the criticism made by appellant. If at any time there was a duty on the part of Lewis to observe the whereabouts of Hold it was before and at the time the signal to move was given. The instruction in the light of the evidence was plain and not confusing. We see nothing in the cases cited by appellant to sustain its contention.

Appellant contends that Hold's death resulted solely from his own negligence. We do not so view the situation. A jury could well find that Hold was justified in assuming that the westward movement would not be made until he had inspected switch number two over which the cars were to pass and had given the signal to move the train. The evidence also shows that at the moment Hold was struck a train was passing over a nearby track at great speed and there was an appreciable amount of noise.

Appellant complains because the trial court refused to give instruction (D) offered by it. Suffice to say that this instruction authorized a verdict for the defendant if the jury found that the defendant company did not violate its duty by kicking the four cars onto track number one without first having a signal from Hold. The instruction ignored the other charge of negligence that it was the duty of Lewis, before giving a signal to move, to observe that Hold was not in danger. Appellant says the instruction should have been given because there was no evidence to support the latter charge. We have heretofore ruled that question adversely to appellant's contention. The instruction was properly refused.

Appellant says instruction number five, with reference to the amount of damages to be assessed, was erroneous because it authorized a recovery of the present value of Hold's future earnings, whereas there was no evidence to establish such value. The instruction. authorized a verdict only for the pecuniary loss which the jury might find plaintiff sustained as the result of the death of her husband. Hold's annual earnings were shown to be about $3600. He was fifty-nine years of age and plaintiff, his wife, was sixty years of age. It was shown that Hold's life expectancy was 14.74 years and plain-

tiff's was 14.10. Evidence was introduced as to the amount plaintiff had been receiving from her husband. With that information a jury would be capable of ascertaining the amount of pecuniary loss plaintiff sustained by reason of loss of benefits she might have expected to receive from her husband. The value of money is well within the knowledge of the average juror. 31 C. J. S., sec. 101, page 701, l. c. 707, "Rates of Interest." A similar instruction was held not erroneous in Western & A. R. R. v. Lochridge, 152 S. E. 474, l. c. 481 (9, 10). In addition to that it must be noted that the trial judge in this case ordered a remittitur in the sum of $20,000. The court evidently considered all the essential elements necessary in arriving at a proper amount. Appellant on this appeal makes no contention that the judgment as it now stands is excessive. We hold defendant was not prejudiced by the instruction.

Error was assigned to the action of the trial court in permitting plaintiff's counsel to argue to the jury that Powers' evidence, given at the trial, was false, being in conflict with that given in a deposition; and to plaintiff's counsel asking the jury to find for plaintiff on the theory that the facts were contrary to Powers' evidence given at the trial. When defendant objected the court ruled as follows:

"The Court: I have already instructed the jury and I will instruct them again that they are to decide this case solely and only from the evidence that you gentlemen heard from the witnesses that appeared here on the witness stand and according to the instructions given to you by the Court. You are to decide this case on that and that alone."

The ruling of the court was not adverse to appellant. Aside from that, counsel had the right in the circumstances to argue that the witness told the truth in his deposition.

Finding no error in the record the judgment is affirmed. *Bohling* and *Barrett, CC.,* concur.

PER CURIAM:—The foregoing opinion by WESTHUES, C., is adopted as the opinion of the court. All the judges concur.