MERLE LUCILLE JANTS, Appellant, v. ST. LOUIS PUBLIC SERVICE COMPANY, a Corporation.—No. 40017.—204 S. W. (2d) 698.

Division Two, September 8, 1947.

Motion for Rehearing or to Transfer to Banc Overruled, October 13, 1947.

*Lloyd Boas* and *Vernon Riehl* for appellant; *Orville Richardson* of counsel.

988

*Fordyce, White, Mayne, Williams & Hartman* and *F. W. Schwarz* for respondent.

990

LEEDY, P. J.—This is an action for $10,000.00 damages for the alleged wrongful death of plaintiff's husband resulting from a collision between a motorcycle on which he was riding and one of defendant's streetcars. Verdict for defendant, judgment accordingly, and plaintiff appealed.

The casualty occurred between 10 and 10:30 p. m., on September 18, 1945, as plaintiff's husband, Marvin C. Jants, was riding a motorcycle west on Easton Avenue (in the City of St. Louis) when it collided with a south-bound Hodiamont streetcar. The case was submitted solely upon humanitarian negligence, in failing to stop the streetcar, or slacken its speed, and thereby avoiding striking the motorcycle upon which plaintiff's decedent was riding after defendant's motorman saw, or by the exercise of ordinary care could have seen, deceased in a position of imminent peril and danger. Plaintiff assigns error in the giving of defendant's instructions, numbered 3 and 4, respectively, and in improperly limiting the scope of cross-examination of one of defendant's witnesses.

Easton Avenue runs east and west, and is about 50 feet wide, with a double set of streetcar tracks about 15 feet in total width down the approximate middle. The north rail of the west-bound track is about 18 feet from the north curb. The north sidewalk is about 15 feet wide. The intersection of the Hodiamont tracks and Easton Avenue is at right angles. (The Hodiamont tracks are not located on Hodiamont Avenue.) About 16 or 17 feet east of the south-bound Hodiamont tracks, there is a two-story business building (newsstand)

abutting on the north sidewalk. Hodiamont Avenue runs north and south, and intersects Easton Avenue about 156 feet east of the southbound Hodiamont car track. Defendant's Wellston car line (consisting of three sets of tracks) enters Easton Avenue from the north about 35 feet east of the Hodiamont tracks, two of which sets loop into the east-bound tracks on Easton, and the other loops into the west-bound tracks on Easton.

On the night in question, the weather was fair, and the streets dry, and well lighted. Jants was proceeding north on Hodiamont Avenue. When he reached the intersection of that thoroughfare and Easton Avenue, he made a left turn (westward) into Easton, and continued west on Easton until the collision occurred, but swerving to the south or left just prior to the moment of impact. The motorcycle was a twin-cylindered Harley-Davidson, and at 30 m. p. h. could not be stopped in 30 feet.

The Hodiamont streetcar, proceeding south, was of the modern, "streamliner" type, with magnetic and track brakes independently operated. It could be stopped, according to various witnesses, in the following distances: For plaintiff—7 or 8 m. p. h. in 15 to 20 feet; 15 m. p. h. in 30 to 35 feet. For defendant—4 m. p. h. in 10 to 12 feet; 7 to 8 m. p. h. in 30 to 35 feet; 8 to 10 m. p. h. in 35 to 40 feet; 10 to 15 m. p. h. in 110 to 120 feet.

There were two eyewitnesses for plaintiff. Both were on the north side of Easton, one about 40 feet west, and the other 60 feet west of the Hodiamont car tracks. They had seen Jants turn into Easton from Hodiamont Avenue. His headlight was burning. According to their testimony, the streetcar came south past the north building line on Easton (which is at least 37 feet north of the point of collision). It came out "pretty fast", seemed to slow down, or start to do so by the sound it made, as it came to the curb line, but then picked up speed. It never slowed down thereafter, or stopped, or sounded a bell or gong, but continued forward at 10-12 m. p. h. These witnesses lost sight of the motorcycle momentarily as the streetcar continued south into Easton Avenue, this because the streetcar obstructed their view, while it passed between them and the motorcycle. Jants was then about opposite the newsstand, or the Wellston car loop tracks. The motorcycle reappeared in front of the streetcar, and its rear fender was struck by the right front corner of the streetcar when the rear wheel of the motorcycle was on the south rail of the west-bound Easton track, and at the west rail of the southbound Hodiamont track. The streetcar continued forward and stopped with its side rear exit door opposite the sidewalk on the south side of Easton.

Defendant's evidence was to the effect that the collision took place south of the center of Easton Avenue. It further showed that just before the collision, the Hodiamont streetcar had stopped and picked

up passengers at its loading station located just north of the building line on the north side of Easton. It started up slowly, moving across the 15-foot sidewalk until it was going 2 to 4 m. p. h. as it crossed the north curb line. Here it slowed down, and then accelerated speed until it was going at a speed variously estimated between 4 and 7-8 m. p. h. as it reached the center of the street. There was evidence that when the motorcycle turned west into Easton Avenue about 150 feet east of the south-bound Hodiamont car track, the streetcar was already about half way across Easton. One witness located the streetcar as "starting across" Easton at that time. In any event, the streetcar was in the intersection first.

Defendant's evidence further showed that the motorcycle came out of Hodiamont and proceeded west along either the north side of Easton, or in or near the west-bound car tracks thereon, at a speed of about 35 m. p. h.; that when it reached a point 10 or 12 feet east of the south-bound Hodiamont tracks, Jants "started cutting to the south," then "swung out [west] in front of the street car when the collision occurred." According to one of defendant's witnesses, the streetcar was at the north rail of the east-bound track when the motorcycle started around the streetcar, the collision occurring at that place, at which time the car was going 7 or 8 m. p. h. Another of defendant's witnesses put the place of collision as at the south rail of the east-bound tracks. Still another of defendant's witnesses testified that when the motorcycle was 25 feet east of the streetcar, Jants suddenly "gunned" his motor, and the front end of the streetcar being then across the west-bound tracks; that Jants "continued on to beat the car," and the collision occurred near the south curb on Easton. There was evidence that the bell or gong on the car was sounded constantly as the car was crossing the intersection. The motorcycle did not decrease its speed at any time, which was clearly established as "fast" or "very fast." The front part of the streetcar struck the motorcycle. Some of the witnesses thought at the right side of the front. The front headlight on the streetcar was broken.

As one of the points raises the question of whether, under the motorman's own testimony, he was negligent as a matter of law, we summarize the relevant portions of such testimony, as follows: After stopping about 1 foot north of the building line for the purpose of taking on 10 to 20 passengers, he started up slowly, and crossed over the north sidewalk, looking to the east while doing so. He saw no traffic coming, though he could see as far east as Hodiamont, and "everything was clear." Ringing the bell all the while, he "slowed down a little bit" when he got a little past the north curb. After passing the north curb, he looked to the west "to see if everything was clear, and then I looked back to the east." He was then near the center of Easton, and the streetcar had attained a speed of 7 or 8 m. p. h. when he heard the "racket" of the motorcycle, and saw it

.at practically the same time. It was then only 10 to 12 feet to his left and it swerved to the left or south, traveling at a speed he was unable to estimate. That was the only time he saw the motorcycle. He put on all the brakes at once—"went into emergency stop." The front end of the streetcar was then on the east-bound track on Easton, near the last, or south rail. At 7 or 8 m. p. h. the streetcar could be stopped in 30 to 35 feet.

As stated, the cause was submitted under the humanitarian doctrine alone, under plaintiff's instruction No. 1, which informed the jury that if they found and believed from the evidence that as the deceased was operating his motorcycle westwardly over and along Easton Avenue, he came into a position of imminent peril and danger of being struck by the streetcar, and that the motorman saw, or by the exercise of ordinary care could have seen the deceased in such a position of imminent peril and danger in time thereafter for the motorman, by the exercise of ordinary care, with the means and. appliances at hand, and with safety, etc., to have stopped the streetcar, or slackened its speed, and thus and thereby have avoided the collision, but failed to do so, then a verdict for plaintiff was authorized, even though plaintiff may have been guilty of negligence in getting into such a position of imminent peril and danger.

Defendant's sole cause instruction (No. 3) of which plaintiff complains, is as follows: "The Court instructs the jury that if you find and believe from the evidence that at the time and place mentioned in the evidence, Marvin C. Jants operated his motorcycle westwardly along Easton Avenue at a high and excessive rate of speed under the circumstances and, if you further find that as the said motorcycle approached the Hodiamont street car tracks the street car mentioned in the evidence was already in the intersection and that Marvin C. Jants drove his motorcycle onto the southbound street car tracks at a time when the street car was so near to the motorcycle and traveling at such a rate of speed that Marvin C. Jants, in the exercise of the highest degree of care, knew or should have known that a collision was likely to result and if you further find that in so doing, if you so find, Marvin C. Jants was negligent and that such negligence, if any, was the sole cause of the collision mentioned in the evidence and that said collision was not caused by or due to any negligence of the defendant.in any of the particulars submitted to you in other instructions herein, then plaintiff is not entitled to recover and you will find your verdict in favor of the defendant."

 This instruction is assailed for a variety of reasons. The first objection urged against it is that it is not supported by substantial evidence; i. e., that the evidence fails to disclose a sole cause situation because, under defendant's own evidence, the motorman was not wholly free of negligence concurring to cause the collision. This on the theory that the failure of the motorman to again look to the east

as the streetcar traveled from the north curb to the point near the center of the intersection where he actually discovered the near approach of the oncoming motorcycle, constituted negligence as a matter of law. It will be recalled that the motorman testified he looked east (the direction from which Jants came) as he started up; that he continued to look in that direction until after he had crossed the 15 foot sidewalk, and there was no traffic in that direction between the car line and Hodiamont Avenue, a distance of 156 feet. After he got a little past the curb, he directed his attention to the opposite direction, the west, "to see if everything was clear", after which he again looked east, at which time he was near the center of the street, and the car was traveling at 7 or 8 m. p. h., (11 feet per second) and discovered Jants 10 or 12 feet to his left. These facts made the question of whether the motorman was in the exercise of due care a question for the jury, and we are unwilling to hold the failure complained of constituted negligence as a matter of law. As plaintiff's contention pivots on this proposition, we overrule the assignment.

At this point, it is not amiss to say that we shall not undertake to analyze the very considerable number of cases cited in support of the several propositions urged by plaintiff. All are distinguishable, but to take them seriatim and so demonstrate would extend this opinion beyond reasonable bounds.

■ The next objection is that the instruction did not hypothesize sufficient facts to negative every essential element of defendant's duty under the humanitarian doctrine, and to demonstrate that its negligence was not a concurring clause of the collision, ■ and that it contained no reference to what the motorman could have done after the deceased entered a position of discoverable peril, and that the converse conjunctive clause did not submit whether defendant was negligent.

The form here employed in submitting the issue of sole cause negligence has been approved in numerous recent cases. Branson v. Abernathy Furniture Co., 344 Mo. 1171, 130 S. W. 2d 562; Jurgens v. Thompson, 350 Mo. 914, 169 S. W. 2d 353; Johnson v. Dawidoff, 352 Mo. 343, 177 S. W. 2d 467; Schlemmer v. McGee, (Mo.) 185 S. W. 2d 806; Kimbrough v. Chervitz, 353 Mo. 1154, 186 S. W. 2d 461. Plaintiff concedes as much, but says the facts were different in those cases, and that in none of them was the conjunctive converse (not-due-to-negligence) clause considered against the attack here leveled. Facts differ in every case, of course, but we find no such differentiation here as to require the application of a different rule. The attack here made on the converse conjunctive clause is that while "submitting whether the collision was *caused* by the negligence of defendant under the humanitarian doctrine, it did not submit whether defendant was *negligent* . . . as set out in [plaintiff's] instruction No. 1", and constitutes a mere abstraction. We do not believe

a jury of laymen in reading the instruction would make any such refinement. If the jury found (as submitted in plaintiff's instruction No. 1) that the death of Jants was the direct result of defendant's negligence under the humanitarian doctrine, then they would not, and could not find that his death was due solely to his own negligence in the particulars hypothesized.

Nor is the instruction subject to the criticism that it unduly limited the danger zone to the actual path of the streetcar. Plaintiff contends that it informs the jury that defendant's duty under the humanitarian doctrine did not begin until Jants was actually on the south-bound track and in the path of the streetcar. Defendant's answer to this proposition—which we think obvious, and sustain—is that it presented two issues: One the sole cause negligence of plaintiff's decedent, and the other negligence of defendant under the humanitarian doctrine, which latter, by appropriate reference, is supplemented by the hypothesized facts in plaintiff's instruction No. 1. The only hypothesized facts as to the respective positions of the motorcycle and the streetcar relate to the charge of excessive speed in connection with sole cause negligence, and do not deal with the position of imminent peril under the humanitarian doctrine.

Plaintiff further contends Jants' excessive speed could not have been anything more than a contributing cause of the collision and, in any event, not the sole cause, and from this premise argues that the instruction erroneously injected contributory negligence into plaintiff's humanitarian case. It is elementary that contributory negligence has no place in a submission under the humanitarian doctrine. The three cases relied on hold as much, but are not in point because they do not deal with the situation here presented. Submission of excessive speed ''as the single sole cause negligence'' is sanctioned. Long v. Mild, 347 Mo. 1002, 149 S. W. 2d 853, 858; Schlemmer v. McGee, supra. True, these cases were submitted on both primary negligence and humanitarian negligence, but this circumstance is immaterial since, in any event, defendant's negligence must be negated as the condition upon which *sole* cause negligence of a plaintiff, or third party, may be found. The language of the instruction beginning with the phrase ''and was so near thereto and traveling at such a rate of speed'' etc., is (except for proper names) an exact duplicate of the one approved in Schlemmer vs. McGee, supra. We think the evidence most favorable to the defendant is sufficient to show there was a situation warranting a finding that the defendant was not negligent, and that the negligent excessive speed of the driver of the motorcycle was the sole cause of the collision. No question of plaintiff's contributory negligence was involved, nor submitted.

We think the instruction is not susceptible to the construction, as contended by plaintiff, that even though the motorman had been negligent under the humanitarian doctrine, the antecedent speed of

deceased might be regarded as an intervening cause so as to absolve defendant from liability. To hold otherwise would impute to a jury of laymen clear·understanding and comprehension of exceedingly intricate principles of law which are troublesome enough to the adept. It is to be borne in mind that in this case plaintiff's instruction No. 1 told the jury "that the negligence, if any there was on the part of the said Marvin C. Jants in getting into a position of imminent peril and danger would ·constitute no defense, and if you find that the said Marvin C. Jants was negligent in said respect, such fact should be disregarded by you." This was favorable to plaintiff, and was stated in such a way as to be readily comprehended. Accordingly, we think there was no likelihood of the jury understanding from the defendant's instruction No. 2 that it would be authorized to find Jants' antecedent speed as a superseding intervening cause, and operating as the proximate cause of the collision. In this situation, what was said in Kimbrough v. Chervitz, supra, is applicable. The instruction there under scrutiny was substantially like the one now under review. It was there said: "The instruction required a finding that plaintiff was negligent in running into the path of the automobile at a time when it was ·so near and traveling so fast that a collision would likely result if he did so; and also that such negligence was the only cause of his injuries. If the jury believed plaintiff's appearance permitted of defendant avoiding the injury under the humanitarian rule the instruction was not applicable and stated no defense to such determined facts for defendant would have been negligent under plaintiff's main instruction and plaintiff's negligence could not have been the sole cause of his injuries. The instruction submitted facts favorable to defendant. Further protection was afforded plaintiff by the additional requirement of a finding that his injuries were not due to any submitted negligence of defendant, for an absence of negligence on the part of defendant legally would preclude a plaintiff's verdict." We have said time and again that instructions must be considered together, especially so when one refers to another for the determination of issues.

 Finally it is urged that the instruction erroneously imposed upon the deceased the duty of exercising the highest degree of care, whereas a motorcyclist is required to exercise only ordinary care. Neither of the cases relied on holds that the operator of a motorcycle is required to exercise only ordinary care. Oesterreicher v. Grupp, 119 S. W. 2d 307, held erroneous an instruction which imposed the duty on plaintiff, "to exercise the highest degree of care in the operation of his motorcycle, *and* avoid colliding with defendant's automobile." This clause (confessedly erroneous in itself) when read in connection with another one, was also held bad as measuring "plaintiff's obligation to avoid the collision by the care, skill and foresight exercised by a most or very competent and prudent person under like

or similar circumstances.'' While not disclosed by the opinion, plaintiff's brief in that case expressly conceded that the Motor Vehicle Act imposed on a person operating a motorcycle the requirement of exercising the highest degree of care. In Schields v. Keller, supra, the vice of the instruction was in the use of the term ''parties'' (in the plural) in defining the degree of care required—one being a pedestrian, and the other a motorist. The portion of the instruction of which the subject in question is a part related to the issue of plaintiff's negligence as the sole cause of the collision. The requirement of exercising the highest degree of care in operating a motor vehicle upon the highways of this state (Sec. 8383 R. S. Mo. and R. S. A.,) extends to operators of motorcycles by virtue of the provisions of Sec. 8366 and Sec. 8367. We therefore disallow plaintiff's contention that only ordinary care was required.

The other defendant's instruction (No. 3) assailed as erroneous reads as follows: ''The Court instructs the jury that if you believe and find from the evidence that as soon as the motorcycle of Marvin C. Jants reached a position of imminent peril and danger of a collision with defendant's street car that the operator of said street car did exercise ordinary care to slow down and stop said street car as quickly as possible; and if you further believe and find from the evidence that the operator of said street car in so doing, did exercise ordinary care to ▪▪▪ avoid a collision with the motorcycle of Marvin C. Jants, but that it was impossible under the then existing circumstances for the operator of said street car, by the exercise of ordinary care with the means and appliances at hand and with safety to himself and the passengers on said street car, to have stopped or slackened the speed thereof and thereby have avoided such collision, if you so find, then the plaintiff is not entitled to recover and your verdict must be for the defendant.''

The objection interposed at the time the instruction was given was ''that it purports to be a converse instruction of the humanitarian instruction offered by plaintiff, but fails to include the negligence of the operator in failing to see the motorcycle crossing said street and entering a position of imminent peril.'' We agree with plaintiff that, under the humanitarian doctrine, defendant's duty began as soon as the deceased's peril was discoverable. It is not enough that a defendant acts with due care after he actually discovers peril, for if he could have discovered the peril sooner and in time to have avoided injury, he is liable for his negligent failure to act. And in this case, the peril arose and the motorman was bound to take action, under the rules of the humanitarian doctrine, as soon as he could have discovered, by the exercise of ordinary care, that a collision was imminent.

The plaintiff's instruction, of which defendant's No. 2 purports to be the converse, required the finding that ''as Jants was operating said motorcycle westwardly over Easton Avenue, he came into and was in

a position of imminent peril . . . and that the defendant's motorman operating said streetcar *saw, or* by the exercise of ordinary care *could have seen* the deceased, Marvin C. Jants, in such a position of imminent peril and danger," etc. While the converse instruction does not *in identical terms* refer to these elements (saw or could have seen), it, nevertheless, places upon the motorman the duty of acting "as soon as the motorcycle . . . reached a position of imminent peril." Until that time the motorman owed no duty to deceased, under the humanitarian doctrine. The converse instruction therefore submits the same proposition, but in different language, and is good as against the objection urged at the trial.

The remaining assignment is that the court "erred in refusing to permit the plaintiff in cross-examination of the witness George Stoops to lay a foundation for his impeachment, and to show his feeling, bias and hositility against the deceased by stating to others that he knew the motorman, and was going to do what he could to show that the motorman was not at fault." The record whereon this assignment rests is, as follows:

"Q. You are a friend of Mr. Borders who operates the streetcar, aren't you? A. No, I don't even know the man.

"Q. You don't know him? A. No.

"Q. Don't you go to a barber shop to get your hair cut there on Easton Avenue south of Wellston? A. Yes, sir.

"Q. Did you ever go in there and make the statement that you knew the man; you are going to do what you could to show that it wasn't his fault? A. No, sir.

"Mr. Owen: If the Court please, I object to the question. I think that is rather an improper question, it is argumentative, it is suggestive of improper conduct on the part of the witness, without any—

"The Court: Sustained."

(The following occurred at the bench out of hearing of the jury):

"Mr. Boas: If the Court please, I want to state that Mr. Russell Gage told me Sunday that he was in that barber shop getting a hair cut a week or so ago and a man who was a policeman from Ladue came in there and made that statement. That is the reason I asked if he said that.

"Mr. Owen: That is hearsay.

"The Court: I will sustain the objection."

Defendants say this presents nothing for review, because it appears that the witness answered the question by denying he had made the statement attributed to him, after which the objection came in, and was sustained, but no motion to strike was made. Plaintiff asserts that "an offer of proof was made that the witness had made the statement ▇▇▇ and was heard by the witness Russell Gage." We do not so construe the record. It purports to be nothing more than an explanation of what prompted counsel in asking the question. What

a third person had said to counsel that the witness had said was, of course, hearsay; but the court did not, by such ruling, exclude the matter embraced in the question propounded *to Stoops* as hearsay. Moreover, the form of that question was improper. It failed to fix the time and the person to whom the alleged statement was made. If the statement made by plaintiff's counsel out of the presence of the jury was intended as a suggestion of its purpose as to lay the foundation for later impeachment, it was an oblique way of putting it. In any event the matter was pursued no further, then or subsequently. It strikes us that the question became important in plaintiff's view only after verdict. We think the record insufficient to present the question sought to be reviewed.

The judgment is affirmed. All concur.