**Ralph TERRELL, Appellant,**

v.

**MISSOURI–KANSAS–TEXAS RAILROAD COMPANY, a Corporation, Respondent.**

No. 45755.

Supreme Court of Missouri, Division No. 2.

June 10, 1957.

Motion for Rehearing or to Transfer to Court en Banc Denied July 8, 1957.

R. Shad Bennett, Clayton, and Gullett &
Gullett, Denison, for appellant.

Fordyce, Mayne, Hartman, Renard &
Stribling and Fred W. Schwarz, St. Louis,
for respondent.

EAGER, Presiding Judge.

This is a suit for personal injuries under
the Federal Employers' Liability Act, 45
U.S.C.A. § 51 et seq. The jury returned
a verdict for the defendant, and plaintiff
appealed, after his motion for a new trial
was overruled. Interstate commerce was
concededly involved. The only questions
raised on this appeal are the propriety of
several instructions given at the request of
defendant, but it will be necessary to review
the facts. We shall refer to the parties as
they appeared below; the amount of plain-
tiff's prayer was $100,000.

Plaintiff, Ralph Terrell, was a brakeman
in defendant's employ; he had been so em-
ployed for approximately 10 years, but dur-
ing portions of this time he had been laid
off due to lack of seniority. On January
17, 1955, plaintiff was one of the brakemen
on a local freight train running from McAl-
ester, Oklahoma, to Denison, Texas. The
injury occurred at Atoka, Oklahoma, at
about 9:00 A.M. on that date. The train
had stopped there to drop off one car and
pick up three others; it stopped on the main
line track, headed south, and about even
with the "tool house." This location was
approximately 567 feet north of the depot.
Between these points, and variously stated
as 356 feet, 338 feet and 428 feet south of
the tool house was a switch leading to an
interchange track of the "OCAA" short line
railroad. The differences in the stated
measurements resulted from the variation
in the respective points on the switch from
which or to which the measurements were
taken. This interchange track ran in a
curve to the northwest, and from it led
southwardly a spur track of the OCAA
which in turn divided into two spurs; these
passed east of the depot, whereas the MKT
track passed it on the west. The three
cars to be picked up were on one of these
spur tracks of the OCAA. The principal
controversy here arises over the making,
and the manner of making, of a "drop
switch" or "flying switch" of these cars by

which they were connected to the south (or head) end of the standing train.

Defendant does not brief any failure of plaintiff to make a submissible case, and it appears rather clearly that plaintiff did so. In considering defendant's instructions, we shall consider whether one or more of them ignored issues of negligence made by plaintiff, and for that purpose we must consider plaintiff's evidence, and in a light favorable to him.

When the train stopped, plaintiff was instructed to, and did, uncouple the first car; the engine (a diesel) pulled it south to the depot where the conductor got the necessary instructions or orders. Plaintiff testified that this car was left attached to the rear of the engine in the subsequent switching operations, whereas defendant's witnesses testified that it was promptly spotted in the MKT yards south of the depot and that plaintiff assisted in that operation. Be that as it may, the engine then backed northwardly into the OCAA interchange or switch until it had passed the entrance to the spurs; it then ran forward and coupled onto the three cars, plaintiff having previously released the brakes. The engine then backed to a point from which it could run forward along the interchange, pushing the three cars, and it did proceed thus to the MKT main line, and headed south; it stopped at a point, stated by plaintiff as "just beyond the depot," and also as about twenty car lengths from the OCAA switch. At this time Eldon Parker, the "list brakeman" in charge of the switching operation, was standing at the switch, and he had given the signal for a "drop switch," which all concerned had seen and understood. This meant (as here employed) that the engine would start backwards, pulling the cars, then check its momentum enough to let "the slack" in the cars run out, whereupon the brakeman riding on the front of the engine would pull the pin on the coupling of the first (north) car; the engine would then accelerate its speed somewhat, and back on into the OCAA switch, whereupon Parker immediately closed or reversed

the switch, and the three cars rolled on down the main line of their own momentum and coupled with the train. In this movement plaintiff was riding on the north end of the north (or lead) car, to handle the braking operation. He was standing on the brake platform attached to the north end of the car, at such a position as to facilitate the handling of the brake. There is no complaint that the brake was not in proper working order. The engine started backing, as planned, braked sufficiently to "run out the slack," and the coupling pin was pulled after proceeding "seven or eight" car lengths, though at a much lesser distance according to other witnesses. One controversy concerns the speed thus attained before the cars were released; plaintiff states that when the pin was pulled they were traveling "about 12 miles an hour." It is uncontroverted that the cars were traveling down a grade of slightly more than one-third of one per cent. One car was loaded with cement. Plaintiff stated that he had taken the slack out of his brake so that it could be applied promptly, and that he had tightened it and released it, but that, as the cars moved, he did not actually apply or tighten the brake to slow the movement until just as his car got "even with the switch," from which point he still had "close to" 360 to 380 feet of distance left for braking. He said that the reason he waited was to prevent stopping the three cars in the switch, which would "foul" it or obstruct it, and therein lies one great source of controversy in the case. In explanation, plaintiff stated that he did not know that he could not control the movement of the cars with the brake until he actually applied it upon passing the switch, when he found it wholly inadequate; he further testified that he then applied the brake with all his strength, but that the cars were not controlled and could not have been controlled with one hand brake under those conditions. In any event, the brake "didn't brake it down," and when plaintiff was 12–15 feet from the train, still traveling at about 12 miles per hour, and fearing that he would be knocked into the train, he started

for the ladder to climb down, but the impact knocked him off and he fell about 14 feet to the ballast right in front of the tool house. His injuries were substantial, including a compressed fracture of the first lumbar vertebra, but there is no point in discussing them here.

The negligence pleaded was: (1) in making a drop switch when there were facilities at hand to make a "power-connected" switching movement; (2) in making this switch under such circumstances that they cars could not be safely controlled by one hand brake; (3) in not allowing sufficient distance between the switch and the train, thus making the operation hazardous; (4) in making the drop switch with the extra car attached to the rear of the engine, thus necessitating a higher speed; (5) in making the "drop" at a high and excessive speed; (6) in making a drop switch in violation of operating rules. We may eliminate (4), for there was no evidence which fairly established that such action might be found negligent.

Plaintiff testified that he had participated in comparatively few drop switches at this location, and in none where more than one car was switched; that Parker, the "list man," was his superior and that plaintiff was required to obey his orders; the evidence also indicated that in switching operations even the engineer followed the orders of the "list man." Plaintiff further testified that there was ample trackage in the south yards for the engine to "run around" the three cars and get on the other end of them, so that it might then back the cars into the train in a "power-controlled" switch which would be safer, because the engineer could then control the speed of the movement at all times. Two of defendant's witnesses admitted that such a movement would or might be safer, but insisted that drop switches were habitually used at that point with three or more cars, and with safety. The reasons given for using the drop switch were: that it saved time, that the yard tracks might be blocked with other cars because they were used primarily for

storage and unloading (though no one actually testified that they were then blocked), and that such cars might have to be re-sorted, that the drop switch was "good railroading" and was the usual method employed, and that the tracks in the south yard were old.

■ Defendant's witnesses testified, as did plaintiff, that there would be no reason in making a drop switch at this point at a speed of 12 miles per hour; the estimates of defendant's witnesses as to the speed of the cars, after their release from the engine, varied from 4 to 6 or 7 miles per hour, all stated as approximate figures. We mention this because plaintiff is entitled to the benefit of any favorable adverse testimony.

Defendant's witnesses insisted that plaintiff could have controlled these cars adequately with the brake, had he used it properly, and that the brake was never fully applied, nor was it applied soon enough. Plaintiff stated, at one point, that his instructions required him to wait until he got by "the point of the switch" before tightening the brakes, which defendant's witnesses denied. Plaintiff testified also that there was a strong wind from the south which, with the down hill grade, accelerated the movement of the cars; he also explained, somewhat confusedly so far as we are concerned, another method of switching cars safely by putting a spike under a wheel, detaching the engine and dislodging the spike, merely letting the cars roll down grade to their coupling with the train, or with the rear end of the engine. This seems to be a variation of the drop switch method.

Two subsections of the "Uniform Code of Operating Rules" of defendant were offered and received, as follows: "When coupling or shoving cars, take proper precaution to prevent damage or fouling of other tracks by stretching coupling, and setting sufficient handbrakes. Make couplings at a speed of not more than 4 miles per hour. * * * Make running switches only when can be made without danger to em-

ployes, equipment or contents of cars. Know that the track is sufficiently clear, switches and brakes in working order and run engine on straight track, when practicable." Plaintiff testified that here the engine could have proceeded north on the main line or "straight track" when the pin was pulled, and the three cars on the OCAA switch, even using the drop switch method; his theory was that this would have accomplished the desired result of getting the engine on the other end of the cars, and he testified that such would have been considerably safer, for the engine could have been stopped readily. Defendant's witnesses testified also that this could have been done, but that it had not been the practice, and that it was no safer than the method used; that there was no danger in the method used if "everybody is on their job." It was not shown that any of the equipment was damaged when the cars struck the train; in fact, there was testimony of defendant to the contrary. Some of defendant's witnesses testified that plaintiff stated, after the accident, that he had jumped, but he denied this, and the matter is immaterial under the present circumstances.

We shall consider first defendant's instruction No. 5. It was as follows: "The Court instructs the jury that if you find and believe from the evidence that said drop switch was made at such a speed and at such a location and under such circumstances that plaintiff could, in the exercise of ordinary care and in the proper discharge of his duties have controlled the movement of said cars so that when reaching the train they would not have been doing in excess of four miles an hour, then your verdict must be in favor of defendant." It will immediately be seen that this instruction submitted only defendant's acts in the *manner* of making the drop switch, and whether plaintiff could, under those circumstances, have controlled the movement and slowed the cars to a speed of four miles per hour; this is a verdict-directing instruction. Plaintiff's "Points"

and argument on this instruction are not overly helpful, but they are sufficient to raise the questions we discuss.

It is almost elementary that a verdict-directing instruction may not ignore issues of negligence shown by substantial evidence. Biehle v. Frazier, 360 Mo. 1068, 232 S.W.2d 465; State ex rel. St. Joseph Belt R. Co. v. Shain, 341 Mo. 733, 108 S.W. 2d 351; Hold v. Term. R. R. Ass'n, 356 Mo. 412, 201 S.W.2d 958; Teague v. Plaza Express Co., 356 Mo. 1186, 205 S.W.2d 563, 567; Smith v. Thompson, 346 Mo. 502, 142 S.W.2d 70; Hensley v. Dorr, Mo., 191 S.W.2d 663; McCall v. Thompson, 348 Mo. 795, 155 S.W.2d 161; Devoto v. St. Louis Public Service Co., Mo.App., 238 S.W.2d 66. This instruction completely ignored the claim that defendant was negligent in not making a "power-controlled" switching movement with the available facilities at hand. There was substantial evidence to make this an issue, regardless of the reasons given by defendant's witnesses against using that method here. Perhaps this objection might have been obviated by a requirement in the instruction that the jury find that the drop switch was, on this occasion and on hypothesized facts, a reasonably safe method of procedure. The instruction nowhere excludes negligence on the part of the defendant; it does not purport to be framed as a sole cause instruction, nor is it sufficient as such. It erroneously permits a consideration of mere contributory negligence (though not designated as such) on plaintiff's part as a complete bar to any recovery. Teague v. Plaza Express Co., 356 Mo. 1186, 205 S.W.2d 563, 567. This, of course, is never permitted in a case under the Federal Employers' Liability Act. Further, even as to the manner of making the drop switch this instruction does not hypothesize the facts, although some of the fact questions involved were vigorously controverted. See, generally, for the necessity of hypothesizing the facts on controverted issues: Hooper v. Conrad, 364 Mo. 176, 260 S.W.2d 496; Ferguson v. Betterton, 364 Mo. 997,

270 S.W.2d 756; Ketcham v. Thomas, Mo., 283 S.W.2d 642. Among the controverted fact issues here were: the speed of the three cars; whether it was negligent to "drop" three cars (one heavily loaded) at that point in a drop switch with only one hand brake being used; the presence of a strong wind; whether the length of trackage allowed for the "drop" was sufficient; and whether the engine should have backed along the "straight track" and allowed the cars to come to rest on the OCAA switch. The last mentioned issue was probably eliminated when plaintiff did not include it in his instruction No. 1. The instruction also ignored the Uniform Operating Rules which were in evidence, except that it improperly assumed that a coupling made at not more than four miles per hour could not constitute negligence, which we do not take to be true under all circumstances. We have not discussed with relation to this instruction the evidence as to the failure to use the "pin" or "spike" type of switch; plaintiff did not submit any issue on that. In plaintiff's instruction No. 1 the court submitted, in the disjunctive, negligence: (1) in making a drop switch when defendant had the facilities at hand to make a power-controlled movement; in (2), (3), (4), (5) and (6) specific claims of negligence in the manner of making the drop switch, such as the speed, the number and loads of the cars, the distances allowed for the movement, the extra car allegedly attached to the engine, the violation of the rules, and the knowledge or means of knowledge on defendant's part that, by reason of all such, the cars could not be safely controlled. To say the least, instruction 5 seems to be in irreconcilable conflict with the first element of negligence so submitted, for it permits a defendant's verdict without any consideration thereof, and without any finding of reasonable safety in the method actually used. We have found no instruction very similar to No. 5, but see, generally: Hold v. Terminal R. R. Ass'n, 356 Mo. 412, 201 S.W.2d 958; Harrington v. Thompson, Mo., 243 S.W.2d

519; Cantley v. Missouri-Kansas-Texas R. Co., 353 Mo. 605, 183 S.W.2d 123, 130; Boyd v. Term. R. R. Ass'n, Mo., 289 S.W. 2d 33; Sandifer v. Thompson, Mo., 280 S.W.2d 412.

■ Defendant, in seeking to uphold this instruction, relies largely upon a concluding paragraph in plaintiff's instruction No. 1, which requires the jury to find that defendant was negligent in one or more of the submitted particulars, and that such "act or acts was the proximate cause" of the cars colliding with the stationary train "with such force, speed or violence" as to injure plaintiff. Counsel say, in effect, that thereby plaintiff rested his case on excessive speed and the concomitant force and violence, and that defendant negatived everything which it was necessary to negative when it required in No. 5 that the circumstances be found to be such that plaintiff could, in the exercise of ordinary care, have adequately controlled and slowed the movement down to 4 miles per hour. We do not believe that the concluding paragraph has so radical an effect; the instruction does not permit the jury to determine whether the use of the drop switch in this particular instance and location, and with 3 cars, was a reasonably safe method of procedure, even when performed in the manner testified to by defendant's witnesses. If it was not, then defendant was negligent, regardless of the degree of plaintiff's negligence, if any; and defendant's negligence would at least have concurred with that of plaintiff to cause the injury. If any negligence of defendant in the selection of a switching method played any part in producing plaintiff's injury, plaintiff may recover, regardless of the extent of his own negligence. Such a situation is not comprehended within the terms of instruction No. 5; it is fallacious to say that plaintiff rested his case solely upon the manner of making the drop switch.

We do not think that counsel's present argument answers validly the objections

that instruction No. 5 fails to exonerate defendant of negligence, that it is certainly not good as a sole cause instruction, that it permits a verdict for defendant upon a finding of contributory negligence of plaintiff, and that it does not sufficiently hypothesize the facts, even on the issues which it purports to cover. Counsel suggest that the opinion in Young v. New York C. & St. L. Ry., Mo., 291 S.W.2d 64, supports the giving of the instruction. We fail to see the similarity. There plaintiff had been furnished a sawhorse, instead of a ladder, for his use in climbing into a box car. The instruction of defendant submitted not only the nonexistence of "any defect or failure of said sawhorse," but required a finding that the use of the sawhorse "was a reasonably safe method," and that plaintiff's own acts were the "sole cause" of his injury. Our present instruction not only ignores any other method or methods except the drop switch, but wholly fails to submit to the jury any possible negligence in selecting and using that method. At most, the Young case supports the proposition that defendant might properly have offered an instruction in the present case requiring the jury to find that the use of the drop switch was a reasonably safe method, hypothesizing the actual facts and circumstances, without making specific reference to any other method or methods.

We hold that the giving of instruction No. 5 was reversible error. So holding, it will not be necessary to discuss in detail the objections to other instructions. Instruction No. 2 required a finding that plaintiff's injuries "were caused" by defendant's negligence. It is sufficient under the act if defendant's negligence caused or contributed in any degree to cause the injuries. Lavender v. Kurn, 327 U.S. 645, 66 S.Ct. 740, 90 L.Ed. 916; Rogers v. Missouri Pacific R. R. Co., 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493; Webb v. Illinois Central R. R. Co., 352 U.S. 512, 77 S.Ct. 451, 1 L.Ed.2d 503. Instruction No. 3, on the burden of proof, is subject to the criticism we have so often leveled at long and complicated burden of proof instructions.

Defendant's instruction No. 6 was as follows: "The Court instructs you that if you find that plaintiff in the exercise of ordinary care, and in the proper discharge of his duties would have attempted to slow down the movement of the box cars before he did, and if you further find that in the exercise of ordinary care and in the proper discharge of his duties he would have attempted to slow down said movement before he did, and that in so failing to do so he was negligent, and that had he done so he could have slowed down said movement to four miles an hour or less before the cars coupled onto the train, and that his failure to so promptly slow down said cars was the sole cause of the cars coupling on to the train in excess of four miles an hour, and if you further find that defendant was not negligent as submitted for your consideration in other instructions, then your verdict must be in favor of defendant." Defendant was entitled to a sole cause instruction based on its evidence. It is necessary, however, to hypothesize the facts of plaintiff's alleged negligence, and we think that such has not been done sufficiently here. See, generally: Janssens v. Thompson, 360 Mo. 351, 228 S.W.2d 743; Johnson v. Dawidoff, 352 Mo. 343, 177 S.W.2d 467, 471; Steffen v. Ritter, Mo., 214 S.W.2d 28; Bootee v. Kansas City Public Service Co., 353 Mo. 716, 183 S.W.2d 892. And see also: Happy v. Blanton, Mo., 303 S.W.2d 633, decided at this session. Ordinarily, such an instruction may exonerate the defendant of negligence by requiring a general finding of no negligence as submitted in one or more other instructions. Long v. Mild, 347 Mo. 1002, 149 S.W.2d 853; Jants v. St. Louis Public Service Co., 356 Mo. 985, 204 S.W.2d 698. But unless the jury is thus guided by a clear reference to all issuable grounds of defendant's alleged negligence, the facts which would exonerate defendant of negligence must be hypothesized. Here, the

required finding "that defendant was not negligent as submitted * * * in other instructions," was, at best, confusing. Plaintiff's instruction No. 1 submitted his several claims of negligence, but defendant's instruction No. 5, already discussed, had confused the issues considerably, and, as we have held, was in conflict with No. 1; and it had ignored the requirement of a finding that the drop switch was a reasonably safe method of procedure. In this situation we hold that the reference to the "other instructions" generally, was misleading and confusing. Some of the language of this instruction is perhaps subject to the criticism appearing in Sheerin v. St. Louis Public Service Co., Mo., 300 S.W.2d 483, at loc. cit. 488(7). Moreover, this instruction assumes that defendant could not in any event be negligent in making a coupling at "four miles an hour" or less, as did instruction No. 5. It is true that one of defendant's rules contained a direction that, in switching, couplings be made "at a speed of not more than 4 miles per hour"; but defendant cannot, by rule, determine what is *not* negligence, and it has not purported to do so. The violation of such an operating rule may be negligence, but the converse is not necessarily true; i. e., a compliance is not necessarily nonnegligent. There is some repetition in No. 6 which may be the result of typographical error in its preparation. We do not believe that the cited cases of Gower v. Trumbo, Mo., 181 S.W.2d 653, Schlemmer v. McGee, Mo., 185 S.W.2d 806, and Jants v. St. Louis Public Service Co., 356 Mo. 985, 204 S.W.2d 698, are of any aid to defendant on this particular instruction.

Instruction No. 7 was as follows: "The Court instructs the jury that if you find and believe from the evidence that in making the drop switch described in evidence defendant's employees in charge of that work exercised ordinary care and that in so making said drop switch defendant was not negligent, then your verdict must be in favor of defendant." It is also complained of, but we think that what we have already said, together with plaintiff's stated objections, should be a sufficient guide for the drafting of the instructions at another trial. We hold that the giving of instructions 5 and 6 was erroneous and prejudicial, for the various reasons already stated; some of the matters noted concerned the most vital elements of the case.

The notice of appeal here states that the appeal is taken "from the judgment and order overruling Motion for New Trial entered * * * on * * *." This court has called to the attention of the bar several times the fact that such an appeal as this is properly taken only from the judgment entered in the cause. Section 512.020 RSMo 1949, V.A.M.S. Our courts have held, however, in Weller v. Hayes Truck Lines, Banc, 355 Mo. 695, 197 S.W. 2d 657, and Boenzle v. U. S. Fidelity & Guaranty Co., Mo.App., 258 S.W.2d 938, that notices such as the present one were sufficient as attempts in good faith to appeal from the respective judgments. The Weller opinion was handed down in 1946, and it seems to us that all members of the bar should now be prepared to take appeals in compliance with the statute, and cease to be content with *attempts* to do so in good faith. Somewhat reluctantly, we hold this notice sufficient.

For the errors noted this cause is reversed and remanded for a new trial.

All concur.